CASE CORPORATION, Appellant and Cross–Appellee,

v.

HI–CLASS BUSINESS SYSTEMS OF AMERICA, INC. and HBS Systems, Inc., Appellees and Cross–Appellants.

No. 05–02–00103–CV.

Court of Appeals of Texas, Dallas.

Dec. 21, 2005.

Rehearing Overruled March 14, 2006.

E. Paul Cauley, Jr., S. Vance Wittie and W. Neil Rambin, Sedgwick, Detert, Morgan & Arnold, LLP, Dallas, for Appellant.

Richard Abernathy, Larry R. Boyd, Charles J. Crawford, Abernathy, Roeder, Boyd & Joplin, P.C., McKinney, Brent L. Brown, Bracewell & Patterson, Cynthia Hollingsworth, Gardere, Wynne, Sewell, L.L.P., Dallas, for Appellees.

Before Justices MORRIS, MOSELEY, and O'NEILL.

## OPINION

Opinion By Justice MOSELEY.

Hi–Class Business Systems of America, Inc. (HBS) contracted with Case Corporation to become an approved or certified vendor of business systems to independently-owned Case dealers.[1] When Case later started a more exclusive "preferred vendor" program that did not include HBS, HBS sued alleging breach of contract as well as fraud in inducing HBS to enter the contract.

The trial court granted summary judgment in favor of Case on HBS's fraudulent inducement claim based on the alleged representations that Case would reduce the number of certified vendors and HBS would be included in the new, exclusive group of preferred vendors. HBS's breach of contract claim and its remaining fraud claims were tried to a jury, which found in favor of HBS on the breach of contract claim and in favor of Case on the fraud claims. The trial court entered judgment based on the jury's verdict (and incorporating its earlier partial summary judgment). Case appeals the judgment entered against it on the breach of contract claim, while HBS appeals the judgment that it take nothing by way of its fraud claims.

For the reasons set forth herein, we conclude there is no evidence to support the jury's finding that Case breached its contract with HBS. We also conclude the trial court properly entered judgment in favor of Case on HBS's fraud claims. Therefore, we affirm the trial court's judgment in favor of Case on the fraud claims, reverse the trial court's judgment in favor of HBS on the breach of contract claim, and render judgment that HBS take nothing by way of those claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties' Business Relationship

Case manufactures construction and agricultural equipment. In North America, Case sold its products through a network of authorized, independently-owned dealerships. HBS sold a computer software program called EPIC, which is an acronym for "Electronic Product Information Catalog." The EPIC program allowed dealers to electronically store and display manufacturers' parts catalogs and service information. HBS also sold dealer business management systems for agricultural equipment dealers. HBS developed EPIC as a "module" part of its dealer business system.

In 1993, Case approached HBS about acquiring a license to use EPIC. In March 1994, the parties signed a "Software

---

1. Hi–Class assigned its rights and obligations for the Canadian operations under the contract to its wholly-owned subsidiary, HBS Systems, Inc. Hi–Class and HBS are referred to collectively as HBS.

License and System Development Agreement," by which HBS granted Case a software license for EPIC. As partial consideration for the EPIC license, Case agreed HBS would be a "certified, full service vendor" of dealer business systems to North American Case dealers.

The parties focus on two paragraphs of the license agreement. Paragraph 3.3 provided that HBS would become a "certified vendor" of business systems to Case dealers after it successfully tested its communications interfaces with Case.[2] Paragraph 5.6 provided that Case would notify its dealers of HBS's "certified vendor" status.[3] It is undisputed that HBS successfully completed the communications interfaces testing, and that Case approved HBS and notified its dealer network that HBS was a "certified vendor." Eventually, HBS was one of nine approved business system vendors.

The license agreement was for five years and was later extended for an additional year; thus, it terminated on March 2, 2000. However, during the term of the agreement Case decided it wanted to reduce the number of dealer business system vendors. Case sent a request for proposal to its certified vendors and received replies from all of them, including HBS. Thereafter, Case selected two vendors, DIS and NDS, as "preferred vendors," and contracted with them to develop the preferred software product and for the right of Case's dealers to use that software at no charge. In a September 17, 1996 letter to its dealers, Case announced the preferred vendor program and set forth a policy or "statement of direction" that included the provisions quoted below:

> Migration to two dealer business system vendors.
>
> Proactive enhancement of the two preferred systems to maximize the benefit to Case dealers and customers.
>
> Provid[ing] a five year transition period to the preferred system vendors.
>
> Continued cooperation with the existing approved vendors during the five year transition period.

The letter announced a series of regional meetings to tell the dealers about "this strategic direction and especially about our preferred vendors." Case communicated its "preferred vendor" direction to its dealers through these meetings and through communications to individual dealers.

Case also decided to work on enhancements to the dealer software systems. One such enhancement was a parts-order fulfillment software application called AMAX,[4] which Case developed in conjunction with DIS.

**2.** Paragraph 3.3 provided:

Approval of HBS as a certified Vendor. As partial consideration for the services to be provided by HBS under this Agreement, HBS shall be designated and accepted as a certified, full service vendor of business systems for all U.S. and Canadian Case dealers upon the successful testing of its communications interfaces with Case. HBS agrees to comply with Case regulations applicable to other approved business system vendors. There will be no charge by Case to HBS for approval for initial or continued certification during the term of this Agreement. HBS will install, at no cost to Case, HBS business system hardware and software used at Case dealerships at a Case facility in Racine and maintain a current version of both hardware and software at this location for the term of this Agreement.

**3.** Paragraph 5.6 provided:

Notice Regarding the Certification of HBS Business System. Case shall notify all U.S. and Canadian Case Dealers of the certification of HBS as an approved business system vendor within ten (10) days from such certification.

**4.** AMAX was software program, resident on the dealer's computer, that built and maintained a file containing information concern-

## B. HBS Files Suit

When HBS was not selected as a preferred vendor, it sued Case, alleging both breach of contract and fraud claims. The breach of contract claim will be discussed in more detail herein. With respect to its fraud claims, HBS asserted in its first amended petition that Case induced HBS to enter the license agreement, and thus gained access to EPIC, by making the following representations:

(a) That as a certified vender, HBS would have access, for at least an assured period of five years, to the lucrative Case dealer market for business systems software;

(b) That Case was in the process of reducing the number of certified vendors to only two or three, and HBS would be included in the newly limited group of certified vendors (the "Hatch representations")[5]; and

(c) That Case would support HBS in its efforts to sell business systems software to Case dealers during the parties' entire relationship.

HBS alleged these representations were material and that they were knowingly false when made or were made recklessly with indifference to their truth or falsity. HBS also alleged that, in reliance on these assurances and the anticipated economic value of being one of a few certified vendors, HBS agreed to the terms of the license agreement (including certain price concessions for producing the Case catalogs) and developed at its own expense a version of EPIC (called SupportPro) specifically tailored for Case dealers. HBS alleged these representations caused it ac-

tual damages "including, but not limited to, lost profits and lost business goodwill." HBS also requested exemplary damages, claiming that Case acted with fraud and/or malice.

## C. Case's Motion for Summary Judgment

Case moved for partial summary judgment on the fraud claims on two grounds. It asserted the Hatch representations—that Case would reduce the number of vendors with HBS to be included in the remaining group—were "far too indefinite to support a fraud claim." It also asserted the fraud claims were barred by the Statute of Frauds because: (a) the alleged "plan" could not be performed within one year; and (b) HBS was "attempting to recover the lost profits it claim[ed] it would have made had Case followed through on Hatch's alleged 'promise.'" Without specifying the basis for its ruling, the trial court granted summary judgment in Case's favor specifically on HBS's fraud claim based on the Hatch representations.

## D. HBS's Third Amended Petition

Subsequently, HBS filed its third amended petition, its live trial pleading.

### 1. Breach of Contract Claims

HBS alleged that Case breached the license agreement, and specifically paragraph 3.3, by its conduct in establishing "preferred" and/or "partner" vendors, excluding HBS from

the "preferred" and/or "partner" group, and then announcing and systematically requiring each of its dealers to do busi-

---

ing the retail demand for parts and the history of parts that a customer bought. That information was sent to Case's mainframe computer, which generated a proposed parts order and sent it to the dealer for consideration.

5. These representations were allegedly made by Jim Hatch, a senior Case executive, at an October 1993 meeting with HBS officers. For convenience, we refer to them as the "Hatch representations."

ness exclusively with preferred/partner vendors in prejudice to HBS' valuable contract right of access to the Case dealer market and its ability to perform on a level playing field.

HBS also alleged that, "in further breach of its contractual obligations," Case took actions to "prevent HBS from performing as a certified, full service vendor under its Agreement...." Specifically, HBS alleged Case spread negative information about HBS and persuaded its dealers to not purchase HBS systems or to cancel pending purchases. As a result, dealers cancelled pending orders with HBS or refused to continue planned purchases. HBS also alleged Case's conduct constituted a breach of the contractual duty of good faith and fair dealing under section 1.203 of the Uniform Commercial Code.

HBS also alleged Case breached the contract by breaching an implied duty of cooperation with respect to HBS's sales:

In light of its conduct of actively working against HBS sales activities during the term of its contract right to sell to Case dealers, Case breached the implied duties to cooperate and not hinder, prevent or interfere with HBS's ability to perform its functions under the Agreement as a certified, full service vendor.

### 2. Tortious Interference Claim

HBS's third amended petition asserted a claim for tortious interference with prospective advantage/business relations. The tortious interference claim was not submitted to the jury; according to Case's brief, HBS abandoned this claim at or before trial. HBS does not contradict this statement and does not raise any issue on appeal as to this claim.

### 3. Fraudulent Inducement Claim

HBS's third amended petition also repeated the three specific allegations that formed the basis of its fraud in the inducement claim in its first amended petition—i.e., the Hatch representations and that HBS would have access to Case's dealer market for five years, and Case would support HBS's efforts to sell software to Case dealers. HBS alleged that, in reliance on these representations, it suffered actual damages "in the form of out-of-pocket losses ... including, but not limited to, *lost value* of the production costs of the EPIC catalogs which were produced at *reduced rates* in consideration for the fraudulent promises, together with the *difference between the fair market value and the reduced cost charges* to Case and Case dealers for workstation licenses and maintenance fees for the EPIC/SupportPro product." (Emphasis added.)

### E. Jury Questions and Answers

The jury found Case breached the license agreement (Question No. 1),[6] causing HBS damages of $2,502,500 (Question No. 3),[7] and that HBS incurred reasonable and necessary attorney's fees. However, the jury found no liability with respect to HBS's remaining fraud claim (Question

---

6. Case had objected to the submission of Question No. 1, contending there was no evidence: (a) that it failed to perform any obligation under the contract; (b) that it prevented or delayed HBS's performance of its part of the contract; or (c) that any breach of the contractual obligation resulted in any legally recognized damages to HBS. The trial court orally overruled Case's objection.

7. The jury found three elements of direct damages, specifically, foreseeable net profits HBS would have received from lost sales to Case dealers of: (1) dealer business systems through the term of the license agreement ($262,500); (2) other products and services collateral to the sales of business systems *before* the expiration date of the license agreement ($700,000); and (3) such collateral sales *after* the expiration date of the license agreement ($1,540,000).

No. 2). Case moved for judgment notwithstanding the verdict on the breach of contract claim, again asserting there was no evidence it breached the license agreement. Case also moved for new trial and, alternatively, to modify judgment, asserting the evidence was legally and factually insufficient to support the jury's breach of contract finding. The trial court overruled both of Case's post-trial motions, and entered judgment based on the jury's verdict and its previous partial summary judgment.

Both parties timely filed notices of appeal. Case appeals the judgment against it on the breach of contract claim, asserting five issues. HBS appeals the judgment against it on the fraud claims, also asserting five issues.

## II. BREACH OF CONTRACT

### A. Sufficiency of the Evidence

In its first issue, Case argues it did not breach the license agreement as a matter of law. HBS accurately describes this issue as a claim that the evidence is legally insufficient to support the jury's answer to Question No. 1. That question, and its related instructions, stated:

Did Case fail to comply with the Software License Agreement dated on or about March 2, 1994?

INSTRUCTION NO. 1:

You are instructed that the License Agreement did not prohibit Case from designating preferred vendors of dealer business systems for its dealers or from simply announcing that it had designated such vendors. You are further instructed that the License Agreement did not require Case to designate HBS as a preferred vendor for dealer business systems.

You are further instructed that in addition to express promises, *every con-*

*tract contains an implied promise that a party will not do anything to delay or prevent the other party from performing his part of the contract.*

(Emphasis added.)

### 1. Standard of Review

Because Case is attacking the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)). We sustain a no-evidence point only if there is no more than a scintilla of evidence proving the elements of the claim. *Id.* at 520 (citing *Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999)). In making this determination, we must "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

### 2. Applicable Law

#### (a) General Legal Principles

The elements of a breach of contract cause of action are: (a) a valid contract; (b) the plaintiff performed or tendered performance; (c) the defendant breached the contract; and (d) the plaintiff was damaged as a result of that breach. *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 235 (Tex. App.-San Antonio 2001, pet. denied). A

breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *Methodist Hosps. of Dallas v. Corporate Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex.App.-Dallas 1991, writ denied).

### (b) Implied Covenants

 Implied covenants are not favored in Texas law. *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). Generally, the court looks beyond the written agreement to imply a covenant only if necessary to effectuate the parties' intent as disclosed by the contract as a whole, but not to make the contract fair, wise, or just. *Id.* An implied covenant is necessary to effectuate the parties' intentions only if the obligation is "so clearly within the contemplation of the parties that they deemed it unnecessary to express it." *Id.* (quoting *Nalle v. Taco Bell Corp.*, 914 S.W.2d 685, 687 (Tex.App.-Austin 1996, writ denied)).

 A duty to cooperate is implied in every contract in which cooperation is necessary for performance of the contract. *Id.* If applicable, this implied duty requires that a party to a contract may not hinder, prevent, or interfere with another party's ability to perform its duties under the contract. *Id.* at 435; *Hallmark v. Hand*, 833 S.W.2d 603, 610 (Tex.App.-Corpus Christi 1992, writ denied). However, as noted by the Fifth Circuit, an implied covenant to cooperate differs

> from the broader and more extreme covenant of good faith and fair dealing that the Texas Supreme Court rejected in *English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983). An implied covenant of good faith and fair dealing places duties of "good faith," "fairness," "decency," and "reasonableness" upon all parties in regard to actions construing the contract, and components, terms and conditions of the contract. [citation omitted]. Implying a promise on the part of one party not to prevent the other party from performing the contract falls far short of implying a covenant of good faith and fair dealing.

*Tex. Nat'l Bank v. Sandia Mortgage Corp.*, 872 F.2d 692, 698–99 (5th Cir.1989) (emphasis added). Thus an implied duty to cooperate differs from an implied covenant of good faith and fair dealing, which the Texas Supreme Court has explicitly rejected:

> To adopt the laudatory sounding theory of "good faith and fair dealing" would place a party under the onerous threat of treble damages should he seek to compel his adversary to perform according to the contract terms as agreed upon by the parties. The novel concept advocated by the courts below would abolish our system of government according to settled rules of law and let each case be decided upon what might seem "fair and in good faith," by each fact finder. This we are unwilling to do.

*English v. Fischer*, 660 S.W.2d 521, 522 (Tex.1983).

### 3. Discussion

Case contends there is no evidence it breached the license agreement. HBS contends the jury's finding to the contrary (Question No. 1) is supported by some evidence that Case breached both express and implied terms of the license agreement. We first consider the agreement's express terms.

### (a) Express Covenants

With respect to HBS's efforts to sell business systems to Case's dealers, Case argues that all the license agreement required it to do was to designate HBS as a certified vendor (paragraph 3.3) and to announce the certification to the dealer network (paragraph 5.6). As it is undis-

puted that Case complied with these obligations, it argues there is no evidence to support the jury's verdict.

In response, HBS's brief states its position as follows: "(a) the contract ... provided HBS access, free from interference, to the Case retail equipment dealer network to sell dealer business systems; and (b) Case's conduct deprived HBS of that right." HBS goes on to argue that Case breached the license agreement

> in multiple ways including (a) the forced migration of dealers to a "preferred vendor" system within the term of the HBS contract; (b) active interference and intentional preemption by Case executives and employees of access by HBS to the market, including a denial of a dealer list; and (3) [sic] the refusal of Case to provide HBS with the specifications necessary to upgrade its communications to satisfy the "New Communications" protocols established by Case.

We consider these arguments individually.

### (i) Dealer List

HBS's argument concerning the dealer list is based on language in a May 1995 amendment to the license agreement, which obligated Case to provide a list of Case dealers to HBS. HBS asserts there is evidence Case failed to comply with this express obligation, thus supporting the jury's finding to Question No. 1. Case responds, *inter alia*, that HBS did not raise this issue in its pleading, and that the issue was not tried by consent.

We agree HBS did not plead this act as a breach of contract. *See Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 254 (Tex.1974) (party pleading specific breaches of duty limited to proving those specific breaches). HBS's trial pleading alleged neither an express obligation to provide a dealer list, nor Case's breach of that obligation; indeed, the pleading does not mention the May 1995 amendment at all. We now turn to whether the issue was tried by consent.

■■■ "[W]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex.R. Civ. P. 67. This rule "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (citation omitted); *see also Libhart v. Copeland*, 949 S.W.2d 783, 797 (Tex. App.-Waco 1997, no writ) (trial by consent limited to those exceptional cases where the parties "clearly" tried unpleaded issue).

■■■ To determine whether an issue was tried by consent, the trial court examines the record not for evidence of the issue, but rather for evidence of trial of the issue. *Libhart*, 949 S.W.2d at 797. A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 719 (Tex.App.-Dallas 2004, no pet.). On the other hand, trial by consent is inapplicable when evidence relevant to an unpleaded matter is also relevant to a pleaded issue; in that case admission of the evidence would not be calculated to elicit an objection, *see In re J.M.*, 156 S.W.3d 696, 705 (Tex.App.-Dallas 2005, no pet.), and its admission ordinarily would not demonstrate a "clear intent" on the part of all parties to try the unpleaded issue.

■■■ The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *See*

*Whatley v. City of Dallas,* 758 S.W.2d 301, 306 (Tex.App.-Dallas 1988, writ denied). But although that discretion is to be exercised liberally in favor of justice, trial by consent is the exception, not the rule, and should not be allowed in doubtful cases. *Id.* A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985).

■ Max Higgs, president of HBS, testified that he and other HBS employees met with Jim Hatch, a senior Case executive, in October 1993—more than a year before the 1995 amendment. According to Higgs, during that meeting Hatch made several representations, including that Case would provide market support to HBS, such as giving it a list of dealers to call for sales. Higgs also testified the dealer list was important to HBS's efforts to sell its product to Case dealers. Case questioned Higgs concerning marketing support and the importance of the dealer list to HBS's marketing campaign.

There was also evidence that after the May 1995 amendment, HBS and Case discussed Case's failure to supply the dealer list, and that HBS made a written request for the dealer list, which it never received.

However, this evidence—even if relevant to whether Case breached the 1995 amendment—was also relevant to one of HBS's pleaded claims—that Case committed fraud by failing to support HBS's efforts to sell dealer business systems.

In closing argument HBS asserted Case's failure to supply it with a dealer list breached the 1995 amendment. However, because the dealer list evidence was relevant to HBS's fraud issue, we cannot conclude that the above evidence was developed under circumstances indicating both parties understood that the issue (whether Case breached the licensed agreement as amended by failing to provide the dealer list) was in the case. *See Johnson,* 148 S.W.3d at 719. Thus, we conclude this issue was not tried by consent. Because this issue was not raised by the pleadings or tried by consent, any evidence concerning whether and when Case provided HBS with a dealer list does not support the jury's finding that Case breached the license agreement.

*(ii) Dealer Migration and Interference*

■ HBS also argues there is evidence that Case breached the express terms of the license agreement in "multiple" ways, including forced dealer migration, interference with the relationships between HBS and Case dealers, and disparagement of HBS and/or its business systems products or services. However, it points to no language in the license agreement, except paragraph 3.3, that it contends Case breached. Indeed, in its brief HBS points to testimony by its chairman, Bob Stone, that the license agreement did not contain express provisions preventing Case from actively interfering with HBS's ability to sell dealer business systems "because it was understood and did not need to be in the contract."

The only provisions in the license agreement relating to Case's obligations vis-a-vis HBS's efforts to sell products to Case's independent dealers are those set forth in paragraphs 3.3 and 5.6; they require Case to designate HBS as a certified vendor and to announce the certification to the dealer network. It is undisputed that Case performed those obligations. Nothing in the license agreement, including paragraph 3.3, expressly required Case to maximize HBS's sales or granted HBS equality with other vendors, i.e., a "most favored nations" clause; neither did the agreement

require Case to promote HBS's sales, i.e., to use its "best efforts" on HBS's behalf. *See Boy Scouts of Am. v. Responsive Terminal Sys., Inc.,* 790 S.W.2d 738, 743–44 (Tex.App.-Dallas 1990, writ denied) (adding "recommended" second vendor did not breach agreement granting first vendor permission to sell products and services to local councils, because first agreement did not make first vendor "vendor of choice" or require scouting organization to "recommend" first vendor, nor did agreement grant first vendor exclusive right to sell). Nor did the license agreement expressly require Case to refrain from taking the actions of which HBS complains, such as forced dealer migration, interference in the relationships between HBS and Case dealers, or disparagement of HBS and/or its business system products or services.

We discuss below whether there is evidence Case breached any implied covenants. However, we conclude evidence of forced dealer migration, interference in the relationships between HBS and Case dealers, and disparagement of HBS and/or its business system products or services does not constitute evidence that Case breached any express terms in the license agreement. In doing so, we reject HBS's broad argument that the license agreement expressly granted it access to the Case dealer network "free from interference...."

#### (iii) New Communications Specifications/Protocols

HBS also contends there is evidence that Case breached an express term of the license agreement—again paragraph 3.3— by failing to work with it to develop AMAX (the parts-order fulfillment software application) and by failing to provide HBS, when requested, certain "new communications protocols" relevant to AMAX. HBS contends the license agreement: (1) required HBS's dealer business systems be able to communicate with Case's mainframe computer; (2) required HBS to invest in Case's communications; and (3) required it to submit to continued testing and certification as set forth in paragraph 3.3 of the license agreement. It argues that, without the new communications protocols, it was unable to perform its responsibilities to Case and the dealers.

██ Paragraph 3.3 expressly provides for "successful testing" of HBS's communications interfaces with Case as a condition for certification; "continued certification" during the term of the license agreement; and HBS's installation of its business system hardware and software used at Case dealerships at Case's Racine facility. Nothing in paragraph 3.3 expressly required Case to develop dealer business system enhancements such as AMAX, to develop such enhancements with HBS, or to provide HBS with communications systems protocols relevant to such enhancements. By its express terms, paragraph 3.3 relates to *HBS's obligations* under the license agreement, *not Case's obligations.* Accordingly, evidence concerning Case's development of AMAX or its refusal to provide HBS, when requested, information related to AMAX is not evidence supporting the jury's finding that Case breached the license agreement.

#### (iv) Conclusion

In conclusion, there is no evidence Case violated an express term of the license agreement. We now address whether there is evidence Case breached any implied covenants to the license agreement.

#### (b) Implied Covenants

HBS argued below and here that there is "an implied duty in contracts to cooperate in the performance of the obligations set forth therein and not to hinder, prevent, or interfere with the other parties (sic) ability to perform." As noted previ-

ously, the trial court instructed the jury in connection with Question No. 1 "that in addition to express promises, every contract contains an implied promise that a party will not do anything to delay or prevent the other party from performing his part of the contract." In its second point, Case asserts the trial court erred by including this instruction.

However, Case does not dispute such an implied covenant exists, at least with respect to some contracts. Rather, Case argues the trial court erred in giving the instruction because there is no evidence it breached any implied covenant of cooperation between the parties. Specifically, Case asserts there was no evidence it delayed or prevented HBS from performing HBS's obligations under the contract, which related to EPIC. Indeed, Case asserts it is undisputed that HBS actually performed its part of the license agreement.

In its brief, HBS's position is the same as it was with respect to its argument that Case breached an express term of the license agreement. Specifically, HBS argues there was an implied covenant that it was entitled to access to the Case dealer network "free from interference" by Case, and that Case breached that covenant by the same actions described above—forcing dealer migration to the "preferred vendor" system; interfering with HBS's access to the Case dealer network market; and refusing to provide HBS with specifications necessary to upgrade its communications protocol.

*(i) Dealer Migration and Interference*

■■■ HBS argues that Case's forced migration of dealers to the newly preferred vendors denied HBS access to the Case dealer market and "emasculated" its ability to sell business systems. Similarly, it argues Case "interfered" with its ability to sell business systems to Case dealers by disparaging HBS and its products.

Case replies that HBS's argument confuses its *performance* of the agreement with its *benefits* from the agreement, and that the evidence concerning the above matters is no evidence that Case impaired HBS's ability to perform under the license agreement. According to Case, HBS's position amounts to an argument that Case violated an implied covenant of good faith and fair dealing, which the Texas Supreme Court has expressly disapproved. We agree with Case.

HBS's complaint is that Case interfered with its ability to sell systems to the dealers. However, the focus of any implied covenant to cooperate is whether Case impeded HBS's ability to *perform its contract obligations*—to license EPIC to Case, to successfully test its communications interfaces with Case (as a pre-condition to being certified), and to "comply with Case regulations applicable to other approved business systems vendors." HBS's ability to sell dealer business systems is a benefit of its contract, not an obligation. Even if Case impeded HBS's sales to Case's independent dealers, it did not interfere with HBS's *performance of its obligations* under the license agreement.[8] Accordingly, evidence concerning forced migration and disparagement is no evidence that Case breached any implied covenant of cooperation.

*(ii) New Communications Specifications/Protocols*

■■■ As noted previously, paragraph 3.3 states: "HBS agrees to comply with Case regulations applicable to other approved business system vendors." HBS

**8.** We again note that HBS abandoned any tortious interference claims at or before trial.

argues that under paragraph 3.3, it was subject to "continued certification" during the term of the license agreement; thus HBS was required to certify that its dealer business system software would support communications with Case's mainframe computer in conjunction with the subsequently-developed AMAX software.[9] HBS argues that by failing to provide HBS with the new communications specifications/protocols for AMAX when requested, Case "blocked" HBS from being able to make this certification, and that this breached Case's implied obligation to not impede HBS from performing its obligations under the license agreement.

There was evidence Case developed AMAX with DIS and made it available in 2000 to the certified business systems vendors, including HBS. However, there is no evidence that before it made AMAX available, Case required HBS or other certified business systems vendors—in order to retain that status—to certify that their respective systems would support AMAX-related communications with Case's mainframe computer. In other words, there is no evidence Case required HBS to support the AMAX software module before it provided HBS with the communications specifications and protocols, or before it required such support from any of its certified vendors. To the contrary, it was undisputed that HBS successfully tested its communications interfaces, was certified, and remained certified during the life of the agreement.[10] Thus evidence concerning the manner in which Case disseminated AMAX-related communications specifications and protocols is no evidence that Case impeded HBS's ability to "comply with Case regulations," or to otherwise perform under the license agreement.

### 4. Conclusion

We conclude there is no evidence that Case breached an express or implied term of the license agreement, and thus no evidence to support the jury's affirmative answer to Question No. 1. We resolve Case's first issue in its favor as to the legal sufficiency of the evidence; we need not consider the factual sufficiency of the evidence.

### B. Case's Additional Issues

In light of our disposition of Case's first issue, we need not consider Case's second issue, in which it argues that the instruction as to implied covenants was improper and should not have been given.

Case's remaining issues [11] attack the jury's findings as to Question Nos. 3, and 4

---

**9.** *See* footnote 4, *supra.*

**10.** Specifically, the record includes the following testimony from Higgs (HBS's president), elicited on cross examination:

> Q: All right. And, in fact, you have been—you were an approved and certified vendor the entire time of your contract, were you not?
> A: We were a certified and—vendor.
> Q: All right. And, in fact, you're still an approved and certified vendor today even though your contract has terminated, correct?
> A: It's—I don't know that's a fact. Case has not informed us.
> Q: Are you dealers still communicating with Case?

> A: As far as I know.

In addition, Charles McCartney, a Case employee, was asked, "As far as you know, today is HBS still certified as a dealer business system by Case?" McCartney replied, "Yes."

Case also introduced evidence that "communication and new specifications" regarding other projects were sent to HBS in the period after the "preferred vendors" had been designated. Higgs testified that when Case provided new communications interfaces, HBS would have to "recertify," and that they did so.

**11.** Case's other issues assert: the trial court's instruction as to an implied covenant in the license agreement was improper and its failure to submit Case's requested instruction on

relating to causation, breach of contract damages, and attorney's fees; these findings were either part of Question No. 1 or conditioned on an affirmative answer to Question No. 1 Because we have concluded that no evidence supports the jury's finding that Case breached the contract, it follows that the jury's other findings as to the breach of contract claim are of no legal significance. *See Am. Recreational Mkts. Gen. Agency, Inc. v. Hawkins,* 846 S.W.2d 476, 478 (Tex.App.-Houston [14th Dist.] 1993, no writ) ("[W]hen jury questions are conditioned upon an affirmative answer to a prior question, a negative answer to the preceding question renders all subsequent findings either improper, immaterial or devoid of legal significance."). Accordingly, we need not address Case's remaining issues. *See* Tex.R.App. P. 47.1.

We now turn to HBS's issues on appeal.

### III. FRAUD/FRAUDULENT INDUCEMENT

#### A. Summary Judgment on Hatch Representations Fraud Claim

As noted previously, one of HBS's fraud claims was based on the alleged representations of Jim Hatch, a Case senior executive, in October 1993 that Case was in the process of reducing the number of certified vendors to only two or three and that HBS would be included in the newly limited group of certified vendors. In its first amended petition, HBS alleged, "Based on the anticipated economic value of certified vendor status as represented by Case, and the assurance it would become one of the newly-limited number of such vendors, and in order to achieve that designation, HBS was induced to agree to certain conces-

sions in producing the Case catalogues at the reduced prices bargained for by Case, in exchange for HBS being among the reduced group of vendors."

Case moved for summary judgment on HBS's fraud claim based on the Hatch representations on two grounds. First, Case argued the alleged representations (to reduce the number of vendors, with HBS included in the newly limited group) were too indefinite to support a fraud claim. Second, Case asserted the alleged representations could not have been performed within one year; thus, the Statute of Frauds barred enforcement of the Hatch representations as well as any fraud claim based on them that sought to recover the benefit of those representations. The trial court granted summary judgment on the Hatch representations fraud claim without specifying the basis for its ruling. In its fifth issue, HBS attacks all these grounds for summary judgment.

#### 1. Standard of Review

 The standards for reviewing a summary judgment are well-established. The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Thus a defendant moving for summary judgment must either: (a) disprove at least one element of the plaintiff's theory of recovery; or (b) plead and conclusively establish each essential element of an affirmative defense. *See City of Houston v. Clear Creek Basin*

an implied covenant was an abuse of discretion (issue two); the evidence was insufficient to prove causation of any damages (issue three); the trial court should not have awarded damages for the period of time after the

license agreement expired (issue four); and HBS was not entitled to attorney's fees or pre-judgment interest because HBS did not prevail on the only claim for which it provided notice (issue five).

*Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 657 (Tex.App.-Dallas 1992, no writ). Conversely, a plaintiff can avoid summary judgment by presenting evidence creating a fact question on those elements of the plaintiff's case under attack or on at least one element of each affirmative defense advanced by the defendant. *Estate of Devitt,* 758 S.W.2d 601, 603 (Tex.App.-Amarillo 1988, writ denied) (citing *Torres v. W. Cas. & Sur. Co.,* 457 S.W.2d 50, 52 (Tex.1970)).

■ When the trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, the summary judgment will be affirmed on appeal if any theory advanced has merit. *Weiner v. Wasson,* 900 S.W.2d 316, 317 n. 2 (Tex.1995).

**2. Statute of Frauds**

We first address whether the Hatch representations fraud claim was barred by the Statute of Frauds.

*(a) Applicable Law—Scope of Statute of Frauds*

■ The Statute of Frauds is an affirmative defense. *Garrod Invs., Inc. v. Schlegel,* 139 S.W.3d 759, 763 (Tex.App.-Corpus Christi 2004, no pet.) (citing *Cuddihy Corp. v. Plummer,* 876 S.W.2d 424, 426 (Tex.App.-Corpus Christi 1994, writ denied)). It is intended to "prevent fraud and perjury in certain kinds of transactions." *Haase v. Glazner,* 62 S.W.3d 795, 799 (Tex.2001). It provides that certain promises and agreements are unenforceable unless they are in writing and signed by the person sought to be charged. TEX. BUS. & COM.CODE ANN. § 26.01(a) (Vernon Supp.2005). The Statute encompasses agreements that are "not to be performed within one year from the date of the making of the agreement." *Id.* § 26.01(a)(6). Thus, when a promise or agreement, either by its terms or by the nature of the required performance, cannot be completed within one year, it falls within the Statute and must be in writing to be enforceable. *Schroeder v. Tex. Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991); *Niday v. Niday,* 643 S.W.2d 919, 920 (Tex.1982).

*(b)* Applicable Law—Damages Recoverable for Fraud

■ Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998). The out-of-pocket measure consists of the difference between the value paid and the value received; it allows the injured party "to recover the actual injury suffered measured by 'the difference between the value of that which he has *parted with,* and the value of that which he has received.'" *Id.* (quoting *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984)). The benefit-of-the-bargain measure consists of the difference between the value of the bargain as represented and the value received. *Id.*

■ However, the Statute of Frauds would be rendered ineffective if a party could recover the benefit of an unenforceable contract by asserting fraud in conjunction with the contract, such as fraudulent inducement. *See Haase,* 62 S.W.3d at 799. Accordingly, the Statute of Frauds also bars fraud claims seeking to recover as damages the benefit of a bargain unenforceable under the Statute of Frauds. *Id.*

*(c)* Enforceability of the Hatch Representations

In support of its motion for partial summary judgment, Case presented evidence that the oral promise or agreement could not have been performed within one year.

Specifically, in his deposition, Higgs (HBS's president) was asked, "Now, it was certainly your understanding based on what Mr. Hatch told you that whatever decision was made about reducing the number of approved vendors in the future, that one of the preferred vendors had to be HBS, correct?" Higgs responded, "HBS would be one of the vendors." Then Higgs was asked:

Q: All right. And you wouldn't be one of the vendors just for a six-month period, but once you were—once the number of vendors was reduced to two or three and HBS was one of those, it had to remain—the full term of the contract, correct?

A: *For the full term of the contract.*

(Emphasis added.) As noted above, the full term of the license agreement was for five years and was later extended for an additional year. Thus, Case's summary judgment evidence established that the alleged oral agreement could not be completed within one year, bringing it within the Statute of Frauds. TEX. BUS. & COM. CODE ANN. § 26.01(a)(6).

In response and on appeal, HBS argues the Hatch representations could have been performed within one year. HBS's argument focuses on the "reduction and selection process," but the Hatch representations—which allegedly induced HBS to enter into the license agreement—also extended to including HBS in the new, exclusive vendor group for the full term of the anticipated license agreement. And, contrary to HBS's argument that the selection and announcement process was the sole agreement set forth in the motion for summary judgment, Case's motion expressly included the second part of the Hatch representations—that HBS be included in the reduced group. Accordingly, we reject HBS's argument that the alleged oral agreement could have been completed within one year.

*(d)* Damages Sought Based on the Hatch Representations

■ Because the Statute of Frauds barred enforcement of the Hatch representations, it also bars fraud claims seeking to recover as damages the benefits of the Hatch representations. *See Haase,* 62 S.W.3d at 799. As mentioned previously, however, the Statute of Frauds does not bar a fraudulent inducement claim for out-of-pocket damages incurred in relying upon an alleged misrepresentation. *Id.* We now address whether the Hatch representations fraud claim sought to recover: (a) the benefit of those representations; or (b) HBS's out-of-pocket costs expended in reliance on those representations.

Case's motion for partial summary judgment asserted HBS was seeking the benefit of the Hatch representations, i.e., lost profits damages for not being included as a "preferred vendor" for the term of the anticipated license agreement. In support of its motion, Case submitted deposition excerpts from two of HBS's damage experts, Helen Reynolds and T. Hardie Bowman, who both opined on the lost profits to HBS from Case's failure to designate HBS as a "preferred" vendor.[12]

■ Lost profits is not a calculation of out-of-pocket damages. *See Formosa Plastics Corp. USA,* 960 S.W.2d at 49–50

---

12. Reynolds's report projected HBS's "lost sales of Case dealer business system installations and related revenues" resulting from Case's actions, and calculated "lost profits to HBS from the loss of those installation sales and related revenue." Bowman's report was titled "A Report on Lost Profits (Revised)" and calculated HBS's lost profits by considering sales revenue and cost of sales. In its brief, HBS acknowledges Bowman makes a lost profit calculation.

("[T]he the out-of-pocket measure only compensates for actual injuries a party sustains through parting with something, not loss of profits on a bid not made, and a profit never realized, in a hypothetical bargain never struck."). Thus Case presented evidence supporting its affirmative defense of Statute of Frauds, and shifting the burden to HBS to produce evidence raising a fact issue on at least one element of this affirmative defense. *See Estate of Devitt*, 758 S.W.2d at 603.

As noted earlier, HBS's pleadings at the time summary judgment was granted alleged that HBS had suffered actual damages "including, but not limited to, lost profits and lost business goodwill." In its response to Case's motion, HBS further characterized its fraud claim as seeking "the lost value of the production costs of the Case catalogs which were produced at reduced rates in consideration for HBS being named among the group of reduced dealer business system vendors." In support of this characterization, HBS referred the court to the affidavit of Higgs, HBS's president, which stated:

I am familiar with the range of costs associated with the conversion of electronic text for use within an electronic parts catalog. It is my opinion that the cost of conversion of electronic text can be as high as $8.00 per page.

Based upon a review of the page conversion done for Case Corporation for their catalogs worldwide, approximately 500,000 pages of text have been converted.

HBS also points to a letter from an HBS attorney that expanded on Higgs's affidavit, stating that in addition to the "in ex-

cess of $3,500,000.00" referred to by Higgs for conversion of electronic text, there were "additional reductions in costs of workstation license fees and reoccurring monthly maintenance fees" given. Further, "[t]he reductions resulted in a cost savings to Case in the millions of dollars." Other than the above, HBS did not indicate it was seeking any other out-of-pocket damages.

 "[T]he out-of-pocket measure only compensates for actual injuries a party sustains through parting with something, not loss of profits on a bid not made, and a profit never realized, in a hypothetical bargain never struck." *See Formosa Plastics Corp. USA*, 960 S.W.2d at 49–50. To avoid this prohibition, HBS essentially argues that what it "parted with" was the opportunity to charge a higher price for producing the catalogs and licensing and maintaining the work stations. However, this characterization is unavailing. *See id.* HBS's description of its claimed damages makes clear HBS was not seeking to recoup its *expenditures* made in reliance on the Hatch representations. Instead, HBS was seeking to collect any prospective additional revenues it relinquished when it contracted: (a) to produce the Case catalogs at a discount from what it normally charged for such production; and (b) to reductions in license and maintenance fees. This measure of damages is unavailable on a fraud claim based on the unenforceable Hatch representations.

*Formosa Plastics Corp. USA* makes clear that a party's "testimony regarding what he would have bid if he had known the truth is not the proper measure of out-of-pocket damages." *Id.* at 49.[13] Higgs's

13. Relying on *PWS Foods, Inc. v. Taco Bell Corp.*, No. 05–01–01211–CV, 2002 WL 523697 (Tex.App.-Dallas Apr.9, 2002, no pet.) (not designated for publication), HBS argues that price discounts are actionable out-of-pocket losses. Opinions not designated for publica-

tion by the court of appeals have no precedential value. *See* TEX.R.APP. P. 47.7. In any event, however, "the out-of-pocket measure only compensates for *actual injuries* a party sustains through parting with something...." *Formosa Plastics Corp. USA*, 960 S.W.2d at

affidavit and the attorney's letter expanding on it also make clear that HBS's fraud claim was seeking the benefit of a hypothetical business transaction—i.e., what it would have sought to charge if the Hatch representations had not been made.[14]

### 3. Conclusion

Case produced evidence, specifically reports of HBS's damage experts, in support of its affirmative defense of Statute of Frauds that HBS was seeking lost profits, not out-of-pocket, damages. HBS failed to meet its burden to produce evidence raising an issue that it sought out-of-pocket damages. Because HBS's fraud claim based on the Hatch representations did not seek to recover out-of-pocket expenses, it was barred by the Statute of Frauds as well. *See Haase,* 62 S.W.3d at 799; *Formosa Plastics Corp. USA,* at 49–50. Accordingly, we conclude that the Hatch representations were unenforceable under the Statute of Frauds. Thus, the trial court properly granted summary judgment in Case's favor on this claim. We resolve HBS's fifth issue against it.[15]

### B. Jury Question and Instructions on Remaining Fraud Claim

#### 1. The Charge

Question No. 2 provided:

Did Case induce HBS to enter the Software License Agreement dated on or about March 2, 1994, by committing fraud?

INSTRUCTION No. 2:

You are instructed that fraud occurs when:

(1) a party makes a material misrepresentation;

(b) the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

(c) the misrepresentation is made with the intention that it should be acted on by the other party; and

(d) the other party acts in reliance on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact or a promise of future performance made with an intent, at the time the promise was made, not to perform as promised. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's actions after the representation is made.

*You are instructed that if, during negotiation of the Agreement, Case promised that it was in the process of reducing the number of dealer business system vendors for Case and that HBS would be included in the limited group*

49; *see Morriss–Buick Co. v. Pondrom,* 131 Tex. 98, 101, 113 S.W.2d 889, 890 (Tex.1938) ("The end desired is actual compensation for the injury—not profit. The true measure in every case of this kind is that rule which gives to the complaining party the actual amount of his loss resulting directly and proximately from the fraud practiced upon him."); *see also Transp. Ins. Co.,* 879 S.W.2d at 16 ("Compensatory damages are intended to make the plaintiff 'whole' for any losses resulting from the defendant's interference with the plaintiff's rights.").

14. Higgs does not state what HBS actually spent to convert the catalogs, only that costs for doing so within the industry "can be as high as $8.00 per page." It is no evidence that HBS was actually out-of-pocket for $8.00 per page of converted text. Further, the attorney's letter focuses on the value *to Case* of any cost reductions, not any references to HBS's out-of-pocket expenses.

15. Because the summary judgment was proper under the Statute of Frauds, we need not address whether the Hatch representations were too indefinite to support a fraud claim.

*of vendors, you cannot consider such promise to be fraud.*

(Emphasis added.) The jury answered in the negative. In its first issue, HBS attacks the submission of the italicized instruction.

### 2. Discussion

HBS first argues the trial court erred by giving the italicized instruction and by refusing to submit a requested question and accompanying instruction with respect to its fraudulent inducement claim based on the alleged Hatch representations—which the trial court had earlier disposed of through summary judgment. Because it had previously granted summary judgment on this claim, the trial court did not err by giving the italicized instruction. *See Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex.1995) (per curiam) (holding partial summary judgment is decision on merits unless set aside by trial court and becomes final upon disposition of other issues in case).

HBS's second argument is that, even if the reduced vendor promise could not constitute fraud, it could be evidence of the "access/support" fraudulent misrepresentation claims. However, HBS does not raise any issue on appeal as to the jury's failure to find that Case's representations concerning access/support constituted fraud. Therefore, any error in refusing to submit any clarifying instructions regarding this fraud claim would be harmless. *See* Tex.R.App. P. 44.1. We resolve HBS's first issue against it.

### C. Jury Instruction on Fraud Damages

Question No. 5 was conditioned on an affirmative answer to Question No. 2 (Case's liability under the remaining fraud claim) and asked the jury, "What sum of money, if any, paid now in cash, would fairly and reasonably compensate HBS for its damages, if any, that resulted from such fraud?" The trial court instructed the jury to consider only "the actual 'out of pocket' loss, if any, sustained by HBS in connection with the licensing of EPIC software to Case." The trial court also instructed the jury that " 'out of pocket' loss" meant "the amount by which the cost to HBS of providing EPIC software and electronic catalogues for Case under the License Agreement exceeded the amount paid to HBS by Case, if any." [16] In its third issue, HBS argues the trial court erred in instructing the jury on fraud damages because it refused to submit the benefit-of-the-bargain measure of damages.

Because Question No. 5 was conditioned on an affirmative answer to Question No. 2, which the jury answered in the negative, any error in the instructions in Question No. 5 is harmless. *See Am. Recreational Mkts. Gen. Agency, Inc.*, 846 S.W.2d at 478. Accordingly, we resolve HBS's third issue against it.

### IV. EXCLUSION OF EVIDENCE

#### A. Evidence of "Lost Sales"

Exhibit 467/467B was a summary in tabular form of notes made by HBS's regional managers concerning conversations they had with Case's independent dealers. The notes indicate that the dealers often stated they decided against purchasing HBS business systems because HBS was not a "preferred" vendor. The notes sometimes recount what the dealers said they were told by Case representatives concerning HBS. Case objected to admission of Exhibit 467/467B on grounds that it contained "multiple hearsay"; it did not comply with rule 803(6), which provides a hearsay exception for records of a regularly conduct-

---

**16.** Despite the conditioning language, the jury answered this question *"$0.00."*

ed activity; and it was "an incomplete summary and was prepared solely for purposes of this litigation." The trial court excluded Exhibit 467/467B. In its second issue, HBS contends the trial court erred in excluding Exhibit 467/467B.

HBS argued in the trial court and on appeal that this exhibit was not offered for the truth of the statements recounted, but rather to show the statements were made; it was a statement of operative facts; and it met several exceptions to the hearsay rule, i.e., the exhibit is a business record and the statements show existing state of mind, are present sense impressions, and admissions of Case's agents.

### 1. Standard of Review and Applicable Law

■■■■ The admission or exclusion of evidence is a matter within the trial court's discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Id.*

■■■■ Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(c). The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n. 5 (Tex.2004). Hearsay within hearsay is admissible "if each part of the combined statements conforms with an exception to the hearsay rule." Tex.R. Evid. 805; *Knox v. Taylor*, 992 S.W.2d 40, 64 (Tex. App.-Houston [14th Dist.] 1999, no pet.).

### 2. Discussion

Because the notes are out-of-court statements offered to prove the truth of the matters asserted, the exhibit is hearsay. *See* Tex.R. Evid. 801(d). Further, because the notes summarize statements made to HBS regional managers by the dealers and, in some instances, statements made by Case employees to its dealers, the exhibit contains multiple hearsay.

■■■■ HBS argues that the notes are not hearsay but admissible as operative facts. Some out-of-court statements do not constitute hearsay. If the mere making of an out-of-court statement—regardless of its truthfulness—has legal significance, then evidence that the statement was made is not hearsay because it is not offered to prove the truth of the matter asserted. *See id.; Williams v. Jennings*, 755 S.W.2d 874, 885 (Tex.App.-Houston [14th Dist.] 1988, writ denied). This is most obvious when "the words proven constitute a necessary part of the cause of action or defense, or as is sometimes said, are 'operative' facts, or part of the 'ultimate issue.'" *Williams*, 755 S.W.2d at 885 (citation omitted); *see Equitable Trust Co. v. Roland*, 644 S.W.2d 46, 51 (Tex.App.-San Antonio 1982, no writ) (noting operative facts "are admissible as evidence to prove the making of an utterance or a statement and not to establish the truth of the contents of such a statement").

■■■■ Here, however, neither the out-of-court statements of HBS's managers (their notes), the out-of-court statements of the Case independent dealers (their conversations with HBS's managers), or the out-of-court statements of Case personnel (their conversations with the Case dealers) constitute operative facts. The "mere making" of any of these statements is not the basis of HBS's fraud claim; rather, HBS's claim is based on Case's representations to HBS prior to the execution of the license agreement. Apart from the truthfulness of the assertions made in Exhibit 467/467B, the exhibit has no relevance to HBS's fraud claim. We need not consider

HBS's argument that this evidence is relevant to the causation and damages elements of its breach of contract claim because there is no evidence Case breached the license agreement.

■ Rule of evidence 803(6) provides an exception to the hearsay rule for "records of regularly conducted activity." [17] TEX.R. EVID. 803(6). Higgs testified essentially that Exhibit 467 met the requirements of rule of evidence 803(6) and that it was not created for the purpose of the litigation. However, the trial court questioned Higgs further as to

> when [the exhibit] was created. When that information came out of a computer and was put on a piece of paper, was it done with an eye towards some staff meeting, some sales meeting, some quarterly meeting, some planning meeting, some project meeting, or was it done with an eye towards helping anybody understand what was going on, especially with respect to this lawsuit.

The trial court asked Higgs "why this piece of paper exists in the form that it exists?" Higgs responded:

> Not being the originator of this document, Your Honor—there were no sales meetings or things of that nature that you just mentioned to me that tells me that that necessarily was the case or the intent of generating this particular report. It was generated August of 2000 thereafter. I do know that we wanted to track the sales we were losing as a result of Case's preferred action.

Whether this particular—I do know that we have tried to calculate to the best of our ability what our lost sales wold have been, what our lost sales actually were in respect to this lawsuit. But to tie this particular document to it, there's nothing that leads me there that tells me that this was it, and I wasn't the originator. I don' know.

The trial court then stated, "In a nutshell, you can't enlighten me as to why this piece of paper exists in this format?" Higgs replied, "I apologize, Your Honor."

Because Higgs failed to establish a business purpose for Exhibit 467/467B not related to this litigation, the trial court did not abuse its discretion in concluding HBS failed to show the exhibit qualified as a exception to the hearsay rule pursuant to rule of evidence 803(6).

■ We need not address HBS's other claims for admissibility because HBS made no attempt to segregate admissible evidence from inadmissible. "It is well settled that where evidence is offered as a whole, only a part of which is admissible, the court does not commit error in sustaining an objection to such testimony, and in such case it is not the duty of the court or the party objecting thereto to separate the admissible from the inadmissible." *Perry v. Tex. Mun. Power Agency*, 667 S.W.2d 259, 265 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). Although HBS argues that examples of notes are admissible under certain exceptions to the hearsay rule, HBS did not offer the notes at trial

**17.** Rule of evidence 803(6) provides:

A memorandum, report, record, or data compilation, in any form, or acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make

the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, ..., unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

individually. *See* TEX.R. EVID. 105(b). Accordingly, we need not address HBS's additional arguments regarding the admissibility of Exhibit 467/467B.

We resolve HBS's second issue against it.

## B. Evidence of Lost Profit Damages

In its fourth issue, HBS contends the trial court erred in excluding testimony relevant to lost profits damages: Dr. Helen Reynolds's expert testimony regarding the "yardstick method" of determining HBS's fraud and contract damages. In the absence of liability, the issue of damages becomes immaterial. *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627 (Tex.App.-Dallas 2004, pet. denied) (citing *Turner v. Lone Star Indus., Inc.*, 733 S.W.2d 242, 246 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.)). Although the jury found Case liable for breach of contract, we have concluded that no evidence supports that liability finding. And HBS does not attack the jury's failure to find Case liable for fraud based on the alleged access/support representations. Accordingly, the exclusion of any evidence on the issue of damages could not have resulted in the rendition of an improper judgment. *See id.* We resolve HBS's fourth issues against it.

## V. CONCLUSION

Because of our resolution of HBS's fifth issue, we affirm the trial court's order granting partial summary judgment for Case on the "preferred vendor" fraud claim. Because of our resolution of HBS's remaining four issues, we affirm the trial court's final judgment in Case's favor on the fraud claims.

Having resolved Case's first and second issues in its favor, we reverse the trial court's final judgment as to the breach of contract claim and render judgment in favor of Case on that claim. Further, we reverse the final judgment in HBS's favor as to attorney's fees, pre-and post-judgment interest, and costs and render judgment that HBS take nothing.