Opinion issued March 25, 2010





 

 

 

 

 

 

 
 

 







In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-08-0472-CV

____________

 TIN INC., D/B/A TEMPLE-INLAND, FORMERLY KNOWN AS
GAYLORD CONTAINER CORPORATION, Appellant


V.


ACTION BOX CO., Appellee






On Appeal from 234th District Court 

Harris County, Texas

Trial Court Cause No. 2003-63481






MEMORANDUM OPINION

 Both parties to this appeal contest the trial court's judgment in this case.
Appellant, TIN Inc. d/b/a Temple Inland, formerly Gaylord Container Corporation
("Gaylord"), contests the trial court's entry of judgment notwithstanding the verdict
("JNOV"). In four issues, Gaylord contends the trial court erred by entering JNOV
in favor of Action Box, Inc. ("Action Box") because (1) there is more than a scintilla
of evidence that Action Box committed the first material breach of the Settlement
Agreement at issue, causing Gaylord to sustain damages; (2) the evidence
conclusively supports a judgment in Gaylord's favor on its "benefit of the bargain"
damages; (3) the evidence conclusively supports a judgment for Gaylord on its
damages resulting from Action Box's failure to complete the Discount Program; and
(4) Action Box failed to present legally sufficient evidence that it complied with the
contractually obligated procedure for ordering products. 

 Appellee, Action Box, contends that the trial court erred by failing to award
Action Box its attorney's fees for appeal. Further, Action Box asserts a conditional
cross-point arguing that the trial court erred by ruling that, as a matter of law, the
Settlement Agreement only obligated Gaylord to fill Action Box's orders that were
for products that Gaylord offered and sold to the market in general. 

 We reverse the trial court's entry of JNOV and enter judgment in favor of
Gaylord in the amount of $5,070.00. 

BACKGROUND

 Action Box manufactures corrugated cardboard boxes. Gaylord is a supplier
of raw material from which such boxes are made. Gaylord's Bogalusa, Louisiana
plant ("Bogalusa") produces bulk boxes as well as other cardboard-related materials. 
The plant's primary product is laminated cardboard boxes, a specialty product
manufactured by only a few other competitors. The cardboard products produced by
Bogalusa vary according to their composition, weight and strength, and are made of
various combinations of cardboard components (i.e., walls, sheets, fluting). Bogalusa
bases its pricing upon the cost of goods sold as well as upon the distance to the
customer, and the market to which it sells varies according to the product produced.

 Action Box was a customer of Bogalusa, primarily purchasing solid fiber
material to manufacture boxes. Eighty percent of the cardboard materials Action Box
uses are single-walled sheets of cardboard.

The Parties' Initial Dispute Leads to a Settlement Agreement

 In 2003, Gaylord filed a lawsuit against Action Box in Louisiana (the
"Louisiana Lawsuit"), in which Gaylord alleged that Action Box owed it $54,533.24
for four orders of solid fiber cardboard in January and March 2003. Shortly
thereafter, Action Box filed a reciprocal lawsuit suit against Gaylord in Harris
County, Texas (the "Texas Lawsuit"), alleging that the cardboard it purchased in
January and March 2003 from Gaylord was pitted and thus defective, causing Action
Box to incur significant damages. Action Box alleged violations of the Texas
Deceptive Trade Practices Act and that Gaylord negligently represented the quality
of its products.

 In May 2004, the parties mediated their dispute regarding the pitted cardboard
and reached an agreement by which Action Box would pay Gaylord $54,533.24 by
June 15, 2004, and Gaylord, upon receiving such payment, would grant Action Box
a 5% discount on certain of its products, up to a total discount of $70,000 (the
"Discount Program"). Jim McIntyre, Gaylord's sales manager at the time, testified
that this was the first such Discount Program Gaylord had ever entered into. On June
1, 2004, Action Box attempted to place its first order taking advantage of the
Discount Program. The order was for a large quantity of single wall sheets--a
product that the Gaylord Bogalusa plant did not generally sell and that it had not
previously sold to Action Box. The order was rejected by Gaylord. McIntyre stated
that the order was rejected because the Gaylord Bogalusa facility, "as a general rule,"
did not produce single wall sheets in the quantity ordered by Action Box because the
plant was "not equipped to handle" the order. McIntyre testified that Action Box was
verbally informed that Gaylord would not fill the order for single wall sheets on the
grounds that single wall sheets were not usually produced by the Bogalusa plant. At
trial, McIntyre testified that, due to the process of manufacturing and the size of the
machines at issue, only 1/100th of the Bogalusa plant's output was single wall sheets. 
McIntyre testified that the small quantities of single wall sheet that were produced
went to four customers, and that most of it was sent to local customers. McIntyre
explained that these sales were "special deals" to accommodate these customers and
that Gaylord sold only a small quantity of single wall board to each of these
customers. McIntyre further testified that much of the single wall material sold was
taken out of overrun from other products. Rick Bailey, a salesman for Gaylord, also
testified that it was "very difficult" to handle sales of single wall sheets and that it
was not the normal course of Gaylord's business to do so. Bailey also testified that
Bogalusa did not sell single wall sheets in the quantities ordered by Action Box. At
trial, purchase orders and testimony showed that Bogalusa sold single wall sheets to
other companies during 2004, but that these sales were in smaller quantities than the
orders placed by Action Box. McIntyre testified that, if Action Box had ordered a
quantity of single wall sheets that he could fill from his overrun supplies, then he
would have filled the order. McIntyre also described that, in the Bogalusa
manufacturing process, the plant's ability to produce a particular product at a
particular price depended upon the dimensions of the sheets ordered as well as the
total square footage of the order. 

 Accordingly, Gaylord faxed the June 1, 2006 order back to Action Box with
the following notation: "Please process through Texas Sheets. Orders not to be
processed through Bogalusa Plant until paid in full by the proposed due date of June
15, 2004." Texas Sheets is a San Antonio facility owned by Gaylord's parent
company, Temple-Inland. Texas Sheets is a "sheet plant" and one of its products is
single wall sheets, although not the specialty heavy weight single wall sheets that the
Bogalusa plant can produce. The fax did not inform Action Box that Bogalusa did
not manufacture single wall sheets in the quantity Action Box sought.

 In mid-June 2004, Action Box and Gaylord formalized their settlement by
executing the Settlement Agreement and Mutual Release ("Settlement Agreement").
The Settlement Agreement stated its purpose was to settle the Texas and the
Louisiana Lawsuits because both parties wished to "avoid further time, expense and
the uncertaint[ies] involved in the lawsuit[s]." Action Box agreed to pay Gaylord
$54,533.24 to settle the Louisiana Lawsuit in exchange for Gaylord's agreement that
it would "release and forever discharge Action Box from any claim asserted or which
could have been asserted in the Louisiana Action" and an agreement that Gaylord
would "dismiss, with prejudice, the Louisiana Action." 

 As to the Texas Lawsuit, the parties formalized the agreed-upon "Discount
Program" under which Action Box would receive a 5% discount on all of its
purchases of solid fiber, solid fiber boxes, triple wall, double wall and single wall
products from the Inland Gaylord-Bogalusa Plant, up to a total discount of $70,000. 
The parties agreed that they would "in good faith . . . attempt to complete" the full
Discount Program by November 30, 2004, but they also agreed that the Discount
Program would last until the full benefits had been received by Action Box. The
Settlement Agreement stated

The prices for the goods (prior to the discount) being sold by Gaylord
to Action Box pursuant to this settlement shall be competitive and
pegged to the current prices being paid by Action Box for the same
goods which Action Box purchases from competitors of Gaylord.


Action Box also agreed that it would "release and forever discharge Gaylord from any
claims asserted or which could have been asserted in the Texas Action" and that it
would "dismiss, with prejudice, the Texas Action." 

 Action Box paid Gaylord $54,533.24 in mid-June 2004, as it had promised in
the Settlement Agreement. Action Box did not, however, file a non-suit or notice of
dismissal of the Texas Lawsuit. 

 In late June and early July 2004, Action Box placed more orders with Gaylord,
again ordering a large quantity of single wall sheets. Gaylord refused to fill these
orders, this time returning the orders via fax with the following notes: "Send to Texas
Sheets. Not run in Bogalusa" and "Not for Bogalusa-We don't run for you. Send to
Texas Sheets." McIntyre testified that Action Box appeared to be ordering "multiple
truckloads" of single-walled sheets, and that he had informed Action Box that the
single wall product it was ordering was something that the Bogalusa plant did not
normally produce. 

 During the summer, Action Box also ordered a quantity of double-walled and
triple-walled sheets, but paid less than the quoted price for the double-walled sheets. 
McIntyre testified that he had charged Action Box a previously quoted price and that
he had not "pegged" the price to the current prices Action Box may have been paying
other suppliers because Action Box did not provide verification of those prices. 
McIntyre also admitted that he was not aware of the particulars of the Discount
Program at the time, but he testified that if Action Box had provided him with
documentation of competitor's prices and informed him of the Discount Program
particulars, he would have lowered the quoted prices accordingly. 

 Despite these ongoing disputes, Action Box continued to place orders for
various products, including double wall and triple wall cardboard. Action Box placed
orders for products on October 12, 2004, and another on January 14, 2005. On
January 21, 2005, Don Sparaco, the plant manager for the Bogalusa plant, wrote a
letter to Action Box informing it that Bogalusa could not produce the requested sizes
of double wall sheets at the price Action Box specified:

We received a fax order from your company for various size double wall
sheets and relayed that we would be happy to process this order through
our Texas Sheets operation. Unfortunately, unless we had overruns
available from orders for converted boxes, Bogalusa could not sell the
ordered products at the prices indicated on your order form. 


 . . . . 


We are willing to produce the products you ordered, but at higher prices
than indicated on your order form. Of course, you would receive the 5%
discount off of our prices, per our Settlement Agreement.

Action Box continued to send orders for products and quantities that Bogalusa did not
normally produce. Sparaco sent another letter to Action Box on March 28, 2005,
stating:

As a member of the solid fiber/corrugated paper industry, you know that
the Bogalusa plant['s] manufacturing and packaging capabilities are
incompatible with your order. . . . Additionally, you are submitting blind
orders for products, with prices already specified. You know . . . this is
not the way we operate. 


. . . .


This lawsuit has created a strange situation. Action Box is now ordering
products under the settlement agreement that you never ordered from
this facility before and which you know the facility cannot fulfill. You
are also submitting orders differently than before. 


. . . .


We are ready to sell to Action Box products sold from this facility in the
ordinary course of business, at a competitive price discounted by the
agreed upon five percent. However, we cannot sell Action Box products
we do not ourselves sell in the ordinary course of our business.


Additional Litigation Arises out of the Settlement Agreement

 In late summer and fall of 2004, while Gaylord and Action Box were
exchanging correspondence regarding the above orders, they were also filing new
claims and suits against each other. On August 6, 2004, Gaylord filed a new lawsuit
in Louisiana, seeking a declaratory judgment that the Settlement Agreement did not
require it to sell Action Box single wall sheets. On September 9, 2004, Action Box
filed its "First Amended Original Petition" in the Texas Lawsuit, which it had never
dismissed despite its agreement to do so--with prejudice--in the Settlement
Agreement. Action Box later added claims for breach of contract, alleging that the
agreement reached between the parties at mediation and the Settlement Agreement
constituted one, single agreement, and that Gaylord had failed to comply with the
terms of that agreement by failing to fill Action Box's June 1, 2004 order for single
wall sheets and that Gaylord "further indicated it would never sell single wall sheets
to Action Box." In addition, Action Box alleged that Gaylord had breached its
agreement to sell products to Action Box at prices that were "pegged to the current
prices being paid by Action Box for the same goods which Action Box purchase[d]
from competitors of Gaylord," and that Gaylord "failed to act in good faith to
complete sales contemplated by the agreement." Action Box sought to recover
damages and attorney's fees based upon Gaylord's alleged breaches. 

 Gaylord counterclaimed, alleging that Action Box had failed to act in "good
faith" to place enough orders to complete the Discount Program. Gaylord alleged that
Action Box had breached the Settlement Agreement by failing to dismiss the Texas
Lawsuit, by opposing abatement of the Texas Lawsuit, and by continuing to prosecute
the Texas Lawsuit. Gaylord also alleged that Action Box's failure to place enough
orders to complete the Discount Program violated the Settlement Agreement. 

 Action Box raised the affirmative defenses of anticipatory repudiation, prior
material breach, and failure of consideration. Action Box also alleged that Gaylord
had failed to mitigate its own damages. 

 Gaylord pled the affirmative defenses of estoppel and failure of consideration. 
In addition, Gaylord asserted that Chapter 154 of the Texas Civil Practice and
Remedies Code barred any recovery by Action Box and that Action Box had
judicially admitted that it could have fulfilled its obligations under the Discount
Program within one year of the Settlement Agreement. Gaylord also argued that
Action Box was not entitled to its attorney's fees because it had not complied with
the requirements of Section 38.002 of the Texas Civil Practice and Remedies Code. 

 Before the case went to trial, Gaylord obtained a ruling from the trial court
construing the Settlement Agreement to mean that Gaylord's obligation to sell
products to Action Box was limited to those products and quantities that the Gaylord-Bogalusa facility actually offered, produced, and otherwise sold to the market in
general. That order is not part of the clerk's record in this appeal. 

The Evidence at Trial

 During trial, Action Box presented evidence that, over the course of 2004,
Bogalusa quoted and sold a large quantity of single wall and double wall sheets to
other companies, but that Gaylord refused to fill Action Box's June and July orders
for what Action Box claimed was a similar product. McIntyre testified that the
products sold to these customers and the products requested by Action Box were
substantially different, and that Bogalusa did not generally offer the single wall
products ordered by Action Box in 2004. Further, both Bailey and McIntyre testified
that Action Box requested a much larger quantity of product than the other customers. 
Brett Camp, purchasing manager for Action Box, testified that Gaylord had never told
Action Box it had a minimum or maximum order for any of its products. Further,
Camp testified that he had never been told, prior to the rejection of the June 1, 2004
order, that Bogalusa did not manufacture and sell single wall sheets to the general
market. Instead, Camp testified that he placed the single wall order with Bogalusa
just as he would have with Action Box's other suppliers, and that he continued to
place the order despite Gaylord's refusal to fill it. Camp testified that he placed an
order for double wall sheets at a price he confirmed with McIntyre, contradicting
McIntyre's testimony that the order was not paid in full. Camp stated that Action Box
continued to place orders, in good faith, with Gaylord to fulfill the Discount Program
but that the companies continued to disagree about the prices to be paid for double
wall sheets and whether Bogalusa was obligated to fill Action Box's orders for single
wall sheets. Camp also testified that Action Box's quick turnaround time on orders
meant that he did not have time to negotiate with a supplier on an unfavorable price,
but that he instead would then take the order to another supplier for a better price. 
Camp confirmed that, over 11 and a half months, Action Box ordered a sufficient
quantity of materials from other suppliers to fulfill its obligations under the Discount
Program and that, had Bogalusa sold it single wall products, Action Box would have
placed these orders through Bogalusa. According to Camp, Gaylord never informed
Action Box that it could only fill orders of single wall products in the amounts it
generally made available to other customers, nor did Action Box know the amount
of single wall sheet Gaylord generally made available to other customers. Camp
stated that he would have accepted an offer from Bogalusa to partially fill the orders
Action Box placed, and he still intended, as late as February 2005, to place orders
under the Discount Program. Other Action Box representatives confirmed Action
Box's intention to continue to place orders under the Discount Program, regardless
of the ongoing disputes with Gaylord. 

 Don Sparaco testified on behalf of Gaylord, estimating that Gaylord had
suffered $398,400 in lost profits as a result of Action Box's failure to complete the
Discount Program by purchasing the required amount of $1,400,000 in products from
the Bogalusa facility. Sparaco's estimate was based upon a general 8.46% profit
margin for the facility, which would have amounted to $48,440 in profits upon
$1,400,000 in sales, less the $70,000 in discounts promised to Action Box. Sparaco
testified that the profit margin depended upon the product ordered, and that 8.46%
was a conservative estimate of the profit Gaylord could have expected. In addition,
Sparaco asserted that Gaylord's mill, which supplied Bogalusa with its raw materials,
also suffered damages of $350,000 in profits lost from sales to the Bogalusa facility
due to Action Box's failure to complete the Discount Program. In total, Sparaco
testified that Gaylord suffered $397,388 in lost profits. Sparaco was cross-examined
on his damages model, and admitted that he had not included a possible 2% discount
for payments within 20 days. Sparaco also admitted that, even if Action Box had not
placed orders for particular products, Gaylord could have used the raw materials and
resources at issue to fulfill other customers' orders at full price, thus reducing its
damages. Finally, Sparaco stated that he did not know the profit margin on single
wall sheets. None of the testifying Gaylord employees stated that they ever informed
Action Box that Bogalusa could supply it with smaller quantities of single wall
product from its overrun supplies.

 Both sides offered the testimony of their trial attorneys regarding the fees their
clients accrued in prosecution and defense of the lawsuit. Martin Shellist, Action
Box's trial counsel, testified at length regarding the fees incurred by his client. 
Shellist testified that the case, pending since 2004, was a complex commercial case
involving legal issues that required the trial court's intervention. Shellist briefly
described his involvement in the mediation and ensuing revival of litigation between
Action Box and Gaylord, describing it as a "shame; a crying shame." Shellist
testified that, in his opinion, the fees Action Box incurred were reasonable and
necessary, and that the fees through trial were estimated to be over $290,000. Shellist
also testified that he believed appellate fees would total over $135,000. Shellist was
cross-examined by Gaylord's attorneys about the segregation of his firm's work on
various causes of action and defenses raised by Action Box during the lawsuit. 

 Gaylord's trial counsel, John Newton, III, also testified about the fees his client
incurred. Newton testified about fees and costs Gaylord incurred to (1) defeat Action
Box's claim for the defective materials it ordered in 2003; (2) prosecute its
counterclaim against Action Box for failing to dismiss the Texas Lawsuit as it had
promised in the Settlement Agreement; and (3) prosecute its second counterclaim
against Action Box for failing to complete the Discount Program in good faith. The
total amount, including estimated trial time, was $373,701.40. Newton testified that
Gaylord was not seeking to recover the fees it incurred in defending itself against
Action Box's breach of contract claim. Like Shellist, Newton also testified that the
case was complicated and time-intensive. Newton also testified that he believed
attorney's fees could reasonably exceed the amount of damages in controversy
because "[Y]ou can't stop working. You have to do the work." 

 Newton also stated that the fees incurred to defeat Action Box's claim for
defective solid fiber board were incurred because Action Box failed to honor its
commitment to dismiss the Texas Lawsuit with prejudice. According to Newton,
Action Box's attorneys drafted a proposed dismissal with prejudice of the Texas
Lawsuit, circulated it to Gaylord, but never filed it. Newton testified that Action Box
instead continued to seek damages relating to the solid fiber board dispute into the
fall of 2004, and that it was his professional opinion that it was necessary for Gaylord
to actively seek the Court's intervention and have that claim dismissed from the
litigation. Newton testified that he filed special exceptions and sent discovery
requests to determine whether Action Box was indeed continuing to seek damages
related to the pitted fiber board, and that he filed a motion for summary judgment on
Gaylord's behalf to finally resolve the issue. According to Newton, all of these
actions caused Gaylord to incur attorney's fees and costs. On cross-examination,
Newton agreed that, even though Gaylord had expended a sum of money in seeing
that Action Box's claims regarding the defective fiber board were finally dismissed,
and it was his opinion that these actions were necessary to protect Gaylord's interests,
the jury was the ultimate decision maker as to whether those fees were reasonably
necessary. Newton was cross-examined regarding his segregation of fees and his
contention that some categories of both Action Box's and Gaylord's attorneys' fees
were not recoverable as a matter of law in the case. 

 Robert M. Roach, Jr., another of Gaylord's attorneys, also testified regarding
Gaylord's attorney's fees. Roach specifically stated that all of the attorney's fees
Gaylord incurred in order to get summary judgment were a direct result of Action
Box's failure to dismiss the Texas Lawsuit. Roach also testified that a distinction
existed between Action Box's decision not to prosecute its defective product claims
in the Texas Lawsuit further and a dismissal of those claims and suit with prejudice.

[Counsel for Action Box:] Just having a case on file somewhere, does
not necessarily cause a party to have any damages.


 [Roach:] I disagree with that completely.


[Counsel for Action Box:] Okay. A party only has damages if they - if
another party actually pursues the case against them and gets a
judgment, isn't that right, sir?


 [Roach:] No, sir, that's silly.


 [Counsel for Action Box:] How am I wrong about that, sir?


[Roach:] Well, I teach my students and associates if a lawsuit is pending
against you, you cannot sit on your hands and do nothing. You have
been sued. And you have got to affirmatively protect your client as long
as that lawsuit is on - is on file. 


So it would be, in my opinion, silly and malpractice to treat this as - as
not being there and something you could ignore.


[Counsel for Action Box:] Yes, sir. What about a lawsuit that has been
released?

 

[Roach:] If it has not been dismissed with prejudice when it is supposed
to be dismissed with prejudice, you have a problem that you have to take
very seriously. And this lawsuit, and that fact that we are here today, is
evidence that if you don't take it seriously you are making a big mistake.


 A third expert witness, John Spalding, also testified on Gaylord's behalf
regarding attorney's fees. Spalding testified that he believed Action Box had made
a strategic decision not to dismiss the Texas Lawsuit, even though it had agreed to do
so in the Settlement Agreement, so that the Texas Lawsuit would remain in force in
case Gaylord sought to file a Louisiana Lawsuit over any disputes that might arise
under the Discount Program. Spalding based this opinion on statements made in
Action Box's bills for its attorneys' time, which revealed that Action Box's attorneys
conducted research on the "first filed rule"--a rule courts generally follow when two
lawsuits are filed in different forums, requiring the latter-filed suit to stop and wait
for the resolution of the earlier suit. (1) Spalding also generally opined as to the
necessity and reasonableness of the fees in the case, stating that Action Box's fees
appeared to be too high and include mistaken entries and some double-invoicing and
that Gaylord's fees appeared to be generally reasonable, with the exception of some
mistaken entries. 

The Jury's Verdict

 At trial, the jury found that both Gaylord and Action Box had breached the
Settlement Agreement. The jury found that Gaylord breached the Settlement
Agreement by, on October 14, 2004 and January 14, 2005, failing to peg its prices to
the then-current prices being paid by Action Box for the same goods that Action Box
purchased from competitors. The jury found that Gaylord's breach of the Settlement
Agreement was material, and assessed benefit of the bargain damages for Action Box
of $13,378.27. The jury awarded Action Box $158,696.97 in attorney's fees for
preparation and trial, but did not award any attorney's fees for appeal. 

 The jury also found that Action Box's failure to dismiss the Texas Lawsuit was
a material breach of the Settlement Agreement, and awarded Gaylord $5,070 as
damages for the cost of defending the lawsuit after Action Box failed to dismiss it. 
The jury did not award Gaylord any additional attorney's fees. 

 The jury was specifically asked which party failed to comply with the
Settlement Agreement first. The jury found that Action Box had been the first to fail
to comply with the Settlement Agreement. 

The Trial Court Enters JNOV

 Gaylord's Motion for JNOV

 After the jury's verdict, Gaylord moved for entry of judgment based on the
jury's verdict and for judgment notwithstanding the verdict. Gaylord asked the court
to enter judgment in accordance with the jury's answers to Questions 13 and 16--
that Action Box's failure to dismiss the Texas Lawsuit was a material breach of the
Settlement Agreement, and that Action Box was the party that first breached the
Settlement Agreement. Further, Gaylord argued that the jury's answers to Questions
2 and 3--that Gaylord had failed to comply with the Settlement Agreement by
refusing to peg its prices in accordance with the Agreement--should be disregarded
in light of the jury's findings that Action Box committed the first material breach of
the Settlement Agreement. Alternatively, Gaylord argued that the evidence was
insufficient to support the jury's answer to Questions 2 and 3. Based upon its
arguments that the jury's answers to Questions 2 and 3 should be disregarded,
Gaylord also argued that Action Box was not entitled to recover its attorney's fees. 

 Gaylord also asked the trial court to enter judgment in accordance with the
jury's answers to Questions 1, 4, and 5--that Gaylord had not breached the
Settlement Agreement by not filling orders Action Box placed on July 6, 2004; March
22, 2005; October 12, 2005. (2) 

 In addition to seeking judgment based upon the jury's answers that Action Box
had been the first to breach the Settlement Agreement, and that Action Box had
materially breached the Settlement Agreement by failing to dismiss the Texas
Lawsuit, Gaylord asked the trial court to award it more damages than the jury had
awarded as damages for Action Box's failure to dismiss the Texas Lawsuit. Instead
of the $5,070 awarded by the jury for Action Box's failure to dismiss the lawsuit,
Gaylord argued that the evidence conclusively established it suffered damages in the
amount of $463,055.76--$65,667.76 in fees and costs related to the lawsuit and
$397,388 in benefit of the bargain damages lost as a result of Action Box's failure to
fulfill its purchasing obligations under the Settlement Agreement. Similarly, Gaylord
asked the court to enter judgment notwithstanding the jury's answer to Question
15--that, despite Action Box's material breach and Gaylord's damages, Gaylord was
not entitled to any attorney's fees.

 Finally, Gaylord asked the trial court to disregard the jury's answer to Question
19--that Action Box had not failed to comply with its obligation under the Settlement
Agreement to make a good faith effort to complete the Discount Program by
November 30, 2004 or a reasonable date thereafter. Instead, Gaylord argued that it
was entitled to judgment that Action Box had not acted in good faith under the
Settlement Agreement and that it was also entitled to receive its benefit of the bargain
damages and attorney's fees. Action Box's Motion for JNOV

 Action Box also moved for judgment notwithstanding the verdict. Action Box
argued that, while the jury found that Action Box was the first to breach the
Settlement Agreement, that the breach was not material and therefore did not excuse
Gaylord's performance under the Discount Program. Accordingly, Action Box
argued that it was entitled to judgment in its favor on its breach of contract claims
against Gaylord. Further, Action Box argued that it was entitled to the full measure
of its alleged benefit of the bargain damages--more than the $13,378.27 awarded by
the jury. Instead, Action Box moved for an award of $69,378.27--the unused amount
of the $70,000 discount that Gaylord promised in the Settlement Agreement. 

Final Judgment

 The trial court entered judgment in favor of Action Box, awarding $69,378.27
for Gaylord's breach of the Settlement Agreement and $158,696.97 in attorney's fees
and costs for preparation and trial. The trial court did not award any attorney's fees
on appeal. 

 Gaylord filed a motion for new trial. Action Box filed a motion to amend the
judgment, arguing that it was entitled to its appellate attorney's fees in the amount of
$85,000. Both Gaylord and Action Box now appeal the trial court's judgment. 

ANALYSIS

I. Standard of Review

 A party with the burden of proof at trial is entitled to JNOV on a particular
issue only if evidence establishes that issue as a matter of law. Cain v. Pruett, 938
S.W.2d 152, 160 (Tex. App.--Dallas 1996, no writ). A trial court may not properly
disregard a jury's negative finding and substitute its own affirmative finding unless
the evidence conclusively establishes the issue. Burns v. Resolution Trust Corp., 880
S.W.2d 149, 154 (Tex. App.--Houston [14th Dist.] 1994, no writ). Similarly, when
a party who did not have the burden of proof at trial requests a judgment
notwithstanding the verdict, it must show there is no evidence upon which the jury
could have relied for its findings. Thompson v. Henderson, 45 S.W.3d 283, 287 (Tex.
App.--Dallas 2001, pet. denied). 

 We review the trial court's entry of a JNOV under a legal sufficiency standard. 
See City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal
sufficiency should be the same for summary judgments, directed verdicts, judgments
notwithstanding the verdict, and appellate no-evidence review."). City of Keller
confirms the four instances in which a legal sufficiency challenge must be sustained,
as follows: (1) there is complete absence of a vital fact; (2) the rules of law or
evidence preclude according weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a scintilla; and (4) the
evidence conclusively establishes the opposite of a vital fact. 168 S.W.3d at 810 &
n.16 (citing, among other cases, King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751
(Tex. 2003)).

 In applying the legal-sufficiency standard, we must credit evidence that
supports the judgment if reasonable jurors could credit that evidence, and we must
disregard contrary evidence unless reasonable jurors could not disregard that
evidence. Id. at 827. Accordingly, we review the evidence in the light most
favorable to the verdict, but disregard all contrary evidence that a reasonable jury
could have disbelieved. Ysleta Indep. Sch. Dist. v. Monarrez, 177 S.W.3d 915, 917
(Tex. 2005) (citing City of Keller, 168 S.W.3d at 812). If the evidence falls within
the zone of reasonable disagreement, we may not invade the role of the fact-finder,
who alone determines the credibility of the witnesses, the weight to give their
testimony, and whether to accept or reject all or any part of that testimony. City of
Keller, 168 S.W.3d at 822. A fact-finder is free to believe all, part, or none of the
testimony of a witness, but a fact-finder's "decisions regarding credibility must be
reasonable." Id. at 820. The fact-finder, however, "cannot ignore undisputed
testimony that is clear, positive, direct, otherwise credible, free from contradictions
and inconsistencies, and could have been readily controverted." Id.

 II. Did the trial court err by entering JNOV that Action Box recover on its
claim against Gaylord and that Gaylord take nothing on its claim against
Action Box? 


 The jury found that both Action Box and Gaylord had materially breached the
Agreement, and that both had incurred damages as a result of the other's breach. The
jury also found, however, that Action Box had committed the first material breach. 
The trial court disregarded the jury's finding that Action Box had committed the first
material breach, and entered JNOV that Action Box should recover from Gaylord and
that it should recover more damages than the jury had awarded. 

 The materiality of Action Box's breach of the Settlement Agreement by failing
to dismiss the Texas Lawsuit was an issue on which Gaylord carried the burden of
proof. Accordingly, we review the record to determine whether there was no
evidence supporting the jury's finding that Action Box's failure to dismiss the Texas
Lawsuit was a material breach of the Settlement Agreement. 

 The essential elements in a suit for breach of contract are: (1) the existence of
a valid contract; (2) the plaintiff performed or tendered performance; (3) the
defendant breached the contract; and (4) the plaintiff was damaged as a result of the
breach. Bank of Tex. v. VR Elec., Inc., 276 S.W.3d 671, 677 (Tex. App.--Houston
[1st Dist.] 2008, pet. denied); Prime Prods., Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d
631, 636 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). "A breach of contract
occurs when a party fails to perform an act that it has expressly or impliedly promised
to perform." Case Corp. v. Hi-Class Bus. Sys. of Am., Inc., 184 S.W.3d 760, 769-70
(Tex. App.--Dallas 2005, pet. denied). A material breach by one party to a contract
can excuse the other party from any obligation to perform. See Mustang Pipeline Co.
v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental
principle of contract law that when one party to a contract commits a material breach
of that contract, the other party is discharged or excused from further performance.");
Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 692 (Tex. 1994). Whether a party
to a contract has breached the contract is generally a question of law for the court,
which determines as a matter of law what the contract requires of the parties. See
Meek v. Bishop Peterson & Sharp, P.C., 919 S.W.2d 805, 808 (Tex. App.--Houston
[14th Dist.] 1996, writ denied). On the other hand, the materiality of a breach--the
question of whether a party's breach of a contract will render the contract
unenforceable--generally presents a dispute for resolution by the trier of fact. See
Cont'l Dredging, Inc. v. De-Kaizered, Inc., 120 S.W.3d 380, 394-95 (Tex.
App.--Texarkana 2003, pet. denied) (citing Hudson v. Wakefield, 645 S.W.2d 427,
430 (Tex. 1983)); Tex. Pattern Jury Charges 101.21-.22 (proposing jury question
on whether defendant's failure to comply with contract was excused, and instructing
that defendant's failure to comply is excused by plaintiff's previous failure to comply
with a material obligation of the same agreement). Materiality may be, however, a
question of law in some cases. See, e.g., Mustang Pipeline Co., 134 S.W.3d at 196,
199 (holding that, because Driver's timely performance was "essential" under terms
of agreement, and Driver undisputedly did not timely perform, materiality of Driver's
breach was question of law that did not require resolution by trier of fact).

 Question No. 13 asked the jury, "Was Action Box's failure to dismiss the
'Texas Action' as defined in the Settlement Agreement a material breach of the
Settlement Agreement?" The Question instructed the jury that the circumstances to
be considered in determining whether a breach of an agreement is material included:

(a) the extent to which the injured party will be deprived of the benefit
he reasonably expected; 


(b) the extent to which the injured part can be adequately compensated
for the part of that benefit of which he will be deprived; 


(c) the extent to which the party failing to perform or to offer to perform
will suffer forfeiture; 


(d) the likelihood that the party failing to perform or to offer to perform
will cure his failure, taking account of the circumstances including any
reasonable assurances; [and] 


(e) the extent to which the behavior of the party failing to perform or to
offer to perform comports with standards of good faith and fair dealing. 


The jury answered, "Yes." In Question 14, the jury awarded $5,070 for Gaylord's
damages, which the question defined as "[t]he cost in defending this lawsuit after
Action Box failed to dismiss it, including but not limited to, attorney's fees and
expenses associated with defending this suit." In Question 15, the jury did not award
any additional attorney's fees relating to Action Box's failure to dismiss the Texas
Lawsuit. In Question 16, the jury was asked, "Who failed to comply with the
Settlement Agreement first?" The jury answered, "Action Box."

 Despite the jury's answers, the trial court entered JNOV in favor of Action
Box. Gaylord now argues that the trial court erred because there was some evidence
supporting the jury's finding that Action Box's failure to dismiss the Settlement
Agreement was a material breach of the Settlement Agreement. On appeal, the
parties do not take issue with the phrasing of the jury question submitted, and Action
Box does not argue that its failure to dismiss the Texas Lawsuit was not a breach of
the Settlement Agreement. Instead, the parties dispute whether there was any
evidence supporting the jury's verdict that the failure to dismiss the Texas Lawsuit
with prejudice was "material." Action Box's briefing essentially concedes it failed
to comply with the Settlement Agreement, but it argues that the Agreement did not
specify a deadline by which it was to dismiss the Texas Lawsuit, Gaylord did not
suffer any damages, and its failure to dismiss the Texas Lawsuit therefore cannot, as
a matter of law, be a material breach excusing Gaylord's performance of the Discount
Program. 

 The Settlement Agreement explicitly stated that its purpose was to allow
Gaylord and Action Box to "avoid further time, expense and the uncertaint[ies]
involved in the lawsuit[s]." The evidence at trial showed that Gaylord and Action
Box had entered into the Settlement Agreement after a mediation involving a number
of the people who actually testified at trial, and that both sides expected the
Settlement Agreement to resolve the differences between them and allow them to
continue to do business with each other. There is no dispute that, after it received
Action Box's payment under the Settlement Agreement, Gaylord dismissed the
Louisiana Lawsuit. The course of dealing between the parties quickly deteriorated
after that. There was some evidence, based upon the timing of the events at issue,
that could have reasonably led the jury to infer that the soured relationship was due,
in some part, to Action Box's failure to dismiss the still-pending Texas Lawsuit, thus
depriving Gaylord of the benefit it sought in the Settlement Agreement and
supporting a finding by the jury that Action Box's breach failed to "comport[] with
standards of good faith and fair dealing." 

 In addition, Gaylord's attorney testified that, as a result of Action Box's failure
to dismiss the Texas Lawsuit as it had promised, he contacted Action Box's attorneys'
to ask them to dismiss the Texas Lawsuit with prejudice and that he even reviewed
and signed an agreed dismissal with prejudice that Action Box's attorneys prepared
and circulated to Gaylord but that Action Box then failed to file with the trial court. 
Once the litigation over the failed Settlement Agreement began in earnest, Gaylord's
attorneys' took steps to clarify Action Box's pleadings as to whether Action Box was
still seeking damages for the claims it raised regarding the pitted cardboard, or
whether Action Box was now solely limiting itself to the allegation that Gaylord was
obligated to sell single wall sheets to Action Box, and to peg its prices to a
competitive price, conducted discovery on the issue, and filed a motion for summary
judgment. There was testimony that Action Box's failure to dismiss the Texas
Lawsuit was a "strategic" decision Action Box made to ensure any further litigation
would be based in Texas rather than Louisiana, and that Gaylord's attorneys
expended time and effort to finally defeat any pending claims relating to the pitted
cardboard, thus incurring damages in the form of attorney's fees for Gaylord. 

 The plain terms of the Settlement Agreement called for Action Box to dismiss
the pending Texas Lawsuit "with prejudice," thus closing the chapter on the original
Gaylord-Action Box dispute regarding the pitted cardboard. A dismissal with
prejudice is the final resolution of a controversy, and the claims raised in the lawsuit
cannot be re-litigated. See, e.g., Mossler v. Shields, 818 S.W.2d 752, 754 (Tex. 1991)
(per curiam) ("[I]t is well established that a dismissal with prejudice functions as a
final determination on the merits."); accord Ritchey v. Vasquez, 986 S.W.2d 611, 612
(Tex. 1999) (per curiam). As Gaylord's attorneys testified, a dismissal with prejudice
is distinct from an instance in which a party files a lawsuit and then decides to delay
or avoid prosecution of that lawsuit without achieving a final resolution of the claims. 
Here, the jury heard evidence from Gaylord's attorneys that Gaylord expected Action
Box to dismiss the Texas Lawsuit with prejudice after the Settlement Agreement was
in effect, and it was their professional opinion that Gaylord was required to defend
itself against any lingering claims Action Box may have been raising in the Texas
Lawsuit relating to the pitted fiber board, notwithstanding the fact that those claims
had been released in the Settlement Agreement. Gaylord's attorney testified that, in
his opinion, it would have been "malpractice" for Gaylord's attorneys to fail to take
action to finally defeat the claim filed against their client, and that Gaylord suffered
damages in the form of attorney's fees and costs as a result of having to finally defeat
any claims relating to the pitted fiber board. Action Box did not present any evidence
to the contrary, but instead contended that its live pleadings, after September 2004,
did not relate to the pitted fiber board. 

 Accordingly, there was more than a scintilla of evidence supporting the jury's
finding that Action Box materially breached the Settlement Agreement by failing to
dismiss the Texas Lawsuit and requiring Gaylord to take action to finally resolve
these claims to achieve the benefit it sought in the Settlement Agreement. We sustain
this part of Gaylord's first issue, and hold that the trial court erred when it entered
JNOV in favor of Action Box and disregarded the jury's finding that Action Box was
the first to materially breach the Settlement Agreement. 


 III. Did Gaylord conclusively establish that it is entitled to $463,055.76 as
damages for Action Box's failure to dismiss the Settlement Agreement? 


 As noted above, the jury found that Gaylord was entitled to $5,070 in damages,
including attorney's fees, as a result of Action Box's failure to dismiss the Texas
Lawsuit. Having found in favor of Gaylord on its breach of contract claim against
Action Box for failure to dismiss the Settlement Agreement, we next turn to the issue
of Gaylord's damages stemming from Action Box's failure to dismiss the Settlement
Agreement. In part of its first issue and in its second issue on appeal, Gaylord argues
that it should recover $463,055.76 as damages for Action Box's failure to dismiss the
Lawsuit because it contends that it conclusively established at trial, as a matter of law,
that it was entitled to such damages in the form of lost profits and attorney's fees. We
disagree. 

 First, the testimony on Gaylord's lost profits fell far short of "conclusive." Don
Sparaco testified regarding Gaylord's general profit margin on the Bogalusa plant,
and based upon that profit margin he conservatively estimated that the Bogalusa plant
and the mill would have earned a combined profit of $398,440 if Action Box had
purchased the full $1.4 million in products under the Discount Program. Sparaco's
testimony was undermined, however, by his admission that he had not included a 2%
discount for prompt payment as called for by the Settlement Agreement, and by his
admission that he did not know the underlying costs of production for the products
listed in the Settlement Agreement. Further, his testimony as to the actual lost profits
was contradicted by his admission that the Bogalusa plant had been able to use the
raw materials and processing effort that it would have directed to filling Action Box's
orders under the Discount Program to filling orders for other customers at full
price--thus presumably making rather than losing money for the Bogalusa facility. 

 Second, the jury heard a great deal of testimony regarding the nature of the
dispute between the two parties, and was the ultimate decision maker as to the
reasonableness and necessity of the attorney's fees incurred by Gaylord. Gaylord asks
us to award the full amount of attorney's fees it claims it incurred as a result of Action
Box's failure to dismiss the Texas Lawsuit with prejudice. Gaylord points to
testimony from its attorneys at trial and argues that the evidence conclusively
established that it incurred $65,667.76 in attorney's fees and expenses as a result of
Action Box's failure to dismiss the Texas Lawsuit, and complains that the jury
essentially awarded it nothing on attorney's fees. We note, however, that the jury's
award of $5,070 in response to Question 14 specifically included "[t]he cost in
defending this lawsuit after Action Box failed to dismiss it, including but not limited
to, attorney's fees and expenses associated with defending this suit." Gaylord does
not complain on appeal that the question was improper. Thus, under the plain
language of the question submitted, Gaylord did recover some of its attorney's fees
related to Action Box's failure to dismiss the Texas Lawsuit. 

 Further, Gaylord's attorneys were subject to cross-examination on the amount
of time they spent on the matters to which they testified, and the jury could have
legitimately found that the attorney's fees in excess of $5,070 were not reasonable in
light of the circumstances of this case, which included breaches of the Settlement
Agreement by both parties and an admittedly long history of contention between
Gaylord and Action Box. 

 "The reasonableness of attorney's fees is ordinarily left to the factfinder, and
a reviewing court may not substitute its judgment for the jury's." Smith v. Patrick
W.Y. Tam Trust, 296 S.W.3d 545, 547 (Tex. 2009) (citing Barker v. Eckman, 213
S.W.3d 306, 314 (Tex. 2006); Ragsdale v. Progressive Voters League, 801 S.W.2d
880, 881 (Tex. 1990)). In Ragsdale, the Texas Supreme Court noted that generally,
"the testimony of an interested witness, such as a party to the suit, though not
contradicted, does no more than raise a fact issue to be determined by the jury." 801
S.W.2d at 882. It recognized "an exception to this rule, which is that where the
testimony of an interested witness is not contradicted by any other witness, or
attendant circumstances, and the same is clear, direct and positive, and free from
contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it
is taken as true, as a matter of law." Id. Here, the evidence about attorney's fees was
subject to extensive cross-examination as to its necessity and reasonableness.

 Ragsdale recognized that its rule would not apply every time that attorney's
fees testimony is undisputed: 

[W]e do not mean to imply that in every case when uncontradicted
testimony is offered it mandates an award of the amount claimed. For
example, even though the evidence might be uncontradicted, if it is
unreasonable, incredible, or its belief is questionable, then such
evidence would only raise a fact issue to be determined by the trier of
fact.


Id. A jury may still find uncontroverted testimony unreasonable if the attendant
circumstances contradict the requested fees. See Stewart Title Guar. Co. v. Aiello,
911 S.W.2d 463, 477 (Tex. App.--El Paso 1995) (holding it is not error for jury to
reduce uncontested attorney's fees), rev'd on other grounds, 941 S.W.2d 68 (Tex.
1997); see also Bethel v. Butler Drilling Co., 635 S.W.2d 834, 842 (Tex.
App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.) (holding jury can award less than
uncontradicted evidence supported for attorney's fees). 

 The evidence regarding attorney's fees Gaylord incurred was subject to cross-examination, and even Gaylord's own expert admitted that some of the time for which
Gaylord sought reimbursement was not recoverable. Each side extensively cross-examined the other about which claims were recoverable and whether the attorneys
had properly segregated their time on the recoverable and non-recoverable claims. 
Further, the attendant circumstances of this case--including but not limited to the
number of lawyers for each side, especially Gaylord, who had three experts on
attorney's fees alone; the protracted history of litigation between the parties; the
questionable conduct of each side in relation to the Settlement Agreement; and the
overall harm, other than attorney's fees, that Gaylord suffered as a result of Action
Box's failure to dismiss the Texas Lawsuit--could have reasonably supported the
jury's decision to award Gaylord less than the full amount of attorney's fees that it
requested. 

 Because Gaylord did not "conclusively establish" that it was entitled to
$463,055.76 in damages, and because Question 14 included an award of attorney's
fees to Gaylord, we find that the evidence supports the jury's award of $5,070 in
Gaylord's favor. We overrule Gaylord's second issue.

 IV. Is there sufficient evidence to support the jury's finding that Action Box
did not breach the Settlement Agreement by failing to "make a good faith
effort to complete the Discount Program" in a timely fashion?


 Gaylord argues that Action Box did not present sufficient evidence that it
complied with the ordering procedure set forth in the Settlement Agreement, and that
Gaylord is entitled to its "conclusively established" damages as a result. We construe
this as an attack on the jury's answer to Question 9. Question 9 asked whether Action
Box had breached the Settlement Agreement by failing to make a good faith effort to
complete the Discount Program by November 30, 2004, or a reasonable time
thereafter. The jury answered, "No." 

 While Gaylord argued otherwise during trial, Action Box's employees
repeatedly testified that they desired to have orders filled by the Bogalusa plant in an
effort to fulfill the Discount Program and thus recoup some of the $70,000 in
discounts to which Action Box was entitled under the Settlement Agreement. 
Although those orders did not always conform to the specifics of the products offered
by the Bogalusa plant, the jury heard testimony and saw evidence that Action Box
submitted orders to Bogalusa and to other competitors and that it fully intended to
complete the Discount Program within the required time frame. Gaylord failed to
conclusively establish that Action Box breached the Settlement Agreement by failing
to make a good faith effort to complete the Discount Program by November 30, 2004,
or a reasonable time thereafter, and there is sufficient evidence to support the jury's
verdict. Accordingly, we overrule Gaylord's third issue on appeal. 

 V. Is there sufficient evidence to support judgment on Action Box's breach
of contract against Gaylord for breach of the Settlement Agreement? 


 In its fourth point of error, Gaylord argues that the jury's finding that it
breached the Settlement Agreement when it failed to fulfill Action Box's October 14,
2004 and January 14, 2005 orders is not supported by sufficient evidence. Because 
the evidence supports the jury's finding that Action Box was the first party to
materially breach the Settlement Agreement, any subsequent breaches by Gaylord
were then excused as a matter of law. Accordingly, we do not reach this issue.




VI. Did the trial court err by failing to award Action Box its attorney's fees
for appeal?


 We next turn to Action Box's cross-issue on appeal. (3) Action Box argues that
the trial court erred by failing to include any amount for appellate attorney's fees in
the judgment in favor of Action Box. Because we have found that the evidence
supports the jury's finding that Action Box was the first party to materially breach the
Settlement Agreement, Action Box is not entitled to recover its attorney's fees. 
Accordingly, we overrule Action Box's issue on appeal. 


CONCLUSION

 We sustain Gaylord's first issue on appeal and reverse the trial court's JNOV
in favor of Action Box. We overrule Gaylord's second, third and fourth issues on
appeal. In accordance with the jury's findings that both parties materially breached
the Settlement Agreement, that Action Box was the party that committed the first
material breach, and that Gaylord suffered $5,070.00 in damages, including attorney's
fees, as a result of Action Box's material breach, we render judgment in favor of
Gaylord in the amount of $5,070.00.





 George C. Hanks, Jr.

 Justice


Panel consists of Justices Jennings, Hanks and Bland.
1. [1] See, e.g., Perry v. Del Rio, 66 S.W.3d 239, 252 (Tex. 2001).
2. [2] While the jury charge only asked the jury whether Gaylord actually offered, produced,
or otherwise sold the products requested in the orders placed on these dates in the
quantities requested, the parties inform us that the trial court had previously ruled that,
if the jury's answer to these questions was "no," then, as a matter of law, Gaylord did
not breach the Settlement Agreement by failing to fill these orders.
3. [3] We do not address Action Box's "conditional cross-point" that the trial court erred in holding
that the Uniform Commercial Code applied to the Settlement Agreement. The order to
which this "conditional cross-point" relates is not part of the record on appeal, and we hold
that Action Box has failed to preserve this issue for our review. Tex. R. App. P. 33.1(a).