

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00147-CV

Clyde E. **KEBODEAUX**,
Appellant

v.

Patricia **KEBODEAUX**,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-CI-00629
Honorable Laura Salinas, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:       Patricia O. Alvarez, Justice
               Luz Elena D. Chapa, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: August 18, 2021

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART

On December 10, 2019, the trial court signed a Final Decree of Divorce, which dissolved the marriage between appellant, Clyde Kebodeaux, and appellee, Patricia Kebodeaux; awarded retroactive child support; and divided the martial estate. In two issues on appeal, Clyde complains the trial court erred in its award of retroactive child support and in dividing the marital estate. We reverse in part, remand in part, and affirm in part.

**RETROACTIVE CHILD SUPPORT**

Clyde asserts the trial court abused its discretion by awarding Patricia retroactive child support for the time period before she filed her petition for divorce. Specifically, Clyde contends (1) Patricia did not provide him with fair notice that she would seek retroactive child support for the time between the date the couple separated and the date she filed her divorce petition, (2) the court erred in awarding Patricia retroactive child support after June 2014 when their son D.K.[1] graduated from high school after already turning eighteen years old in March 2014, and (3) the trial court erred in calculating the amount of child support. Clyde also asserts the trial court abused its discretion in calculating the total payments he made to Patricia over the course of their six-year separation, and this miscalculation affected the amount that should have been credited to him in the division of the marital estate.

**A. Applicable Law**

"There are four 'types' of child support that a court may order one parent to pay to the other—temporary, current, medical, and retroactive." *In re B.R.F.*, 457 S.W.3d 509, 510 (Tex. App.—El Paso 2014, no pet.) (citation omitted). A court may order a parent to pay retroactive child support when, as here, "the parent . . . has not previously been ordered to pay support for the child . . .." TEX. FAM. CODE § 154.009(a)(1).

In determining whether the trial court erred in awarding retroactive child support, the applicable standard of review is abuse of discretion. *In re J.G.Z.*, 963 S.W.2d 144, 146 (Tex. App.—Texarkana 1998, no pet.); *see also Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam). The test under the abuse of discretion standard is whether the court acted arbitrarily or unreasonably, without reference to guiding rules and principles. *Worford*, 801 S.W.2d at 109.

---

[1] To protect the identity of the minor child, we refer to the child by initials. *See* TEX. FAM. CODE § 109.002(d).

## B. Background

D.K. was born on March 9, 1996. When Patricia originally filed for divorce in January 2013, D.K. was sixteen years old. In her divorce petition, Patricia did not specifically request child support for any period of time before she filed the petition. Instead, in her petition, she stated Clyde "should be ordered to make payments for the support of the child and to provide medical child support in the manner specified by the Court." By the time the trial court signed the divorce decree, D.K. was in his twenties. The divorce decree stated as follows:

> The Court finds that during the pendency of the divorce proceedings. D.K., the child the subject of this suit, resided exclusively with Patricia Kebodeaux who was D.K.'s primary caregiver. The Court further finds that no temporary order for support was ever entered in this suit.

> Therefore, the Court finds that Clyde E. Kebodeaux is obligated to provide support for D.K. from the time the Parties separated, August 31, 2011, through D.K.'s graduation from high school, June of 2016.

> The Court further finds that guideline child support for this period of time is eighty-one thousand three hundred and seventy dollars ($81,370.00). The Court finds that child support in the amount of $81,370.00 has been provided to Patricia Kebodeaux, and as of the date of this order, Clyde E. Kebodeaux owes $0.00 in current and back child support for D.K.

In its findings of fact, the court found, "[d]uring the pendency of the divorce proceedings Clyde E. Kebodeaux paid Patricia Kebodeaux a total of $121,402, of which $40,032 was not deemed child support."

## C. Fair notice

Clyde asserts the trial court erred by awarding to Patricia child support prior to the date she filed her petition in January 2013 because her petition did not plead for retroactive child support; thereby, failing to provide him with fair notice. Patricia asserts the wording in her petition provided Clyde with fair notice of her request for child support during the pendency of the case. The issue, however, is not whether this wording gave Clyde fair notice that Patricia would seek child support

during the *pendency* of the case. The issue is whether the wording in Patricia's petition gave Clyde fair notice that Patricia would seek retroactive child support *prior* to the date she filed her petition.

"Specific notice is required when retroactive child support is being sought." *Martinez v. Martinez*, 61 S.W.3d 589, 590 (Tex. App.—San Antonio 2001, no pet.) (citation omitted); *J.G.Z.*, 963 S.W.2d at 148. In Texas practice, however, fair notice is sufficient. *Taylor v. Taylor*, 337 S.W.3d 398, 401 (Tex. App.—Fort Worth 2011, no pet.). Pleadings must give "fair notice of the claim involved" to the opposing party. *See* TEX. R. CIV. P. 45(b), 47(a). "Generally, a pleading provides fair notice of a claim when an opposing attorney of reasonable competence can examine the pleadings and ascertain the nature and basic issues of the controversy and the relevant testimony." *Taylor*, 337 S.W.3d at 401.

"As a reviewing court, we are to liberally construe the petition to contain any claims that reasonably may be inferred from the specific language used in the petition and uphold the petition as to those claims, even if an element of a claim is not specifically alleged." *Flowers*, 407 S.W.3d at 457-58. "In making this determination, however, we cannot use a liberal construction of the petition as a license to read into the petition a claim that it does not contain." *Id.* at 458. "The petition must give fair and adequate notice of the claims being asserted, and if we cannot reasonably infer that the petition contains a given claim, then we must conclude the petition does not contain the claim." *Id.*

In her petition, Patricia merely stated Clyde "should be ordered to make payments for the support of the child and to provide medical child support in the manner specified by the Court." The *Taylor* court found identical language gave the father fair notice of the mother's request for child support during the *pendency* of the case. *Taylor*, 337 S.W.3d at 401. However, the court noted the mother's "only relevant requests for child support are that [the father] 'be ordered to make payments for the support of the child' and that the trial court should make a temporary order

requiring [the father] to pay 'child support, health insurance premiums for coverage on the child, and 50 percent of the child's uninsured medical expenses while this case is pending.'" *Id.* at 402. Therefore, the court concluded, "[n]othing in her pleading even hints that she sought child support for dates prior to the date of her original petition." *Id.*; *see also Espronceda v. Espronceda*, 13-15-00081-CV, 2016 WL 3225860, at *4 (Tex. App.—Corpus Christi June 9, 2016, no pet.) (mem. op.) (concluding that, even when liberally construed, the pleadings did not give fair notice that Handy was seeking an award of retroactive child support when Handy requested child support "in the manner specified by the Court" but did not specifically ask for the support to be made retroactive).

We conclude Patricia did not provide Clyde with fair notice, much less specific notice, that she sought retroactive child support for the time preceding the filing of her petition for divorce. However, "[i]f issues not raised by the pleadings are tried by express or implied consent of the parties, these issues shall be treated as if they had been raised by the pleadings." *Flowers v. Flowers*, 407 S.W.3d 452, 458 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see* TEX. R. CIV. P. 67, 301; *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991).

## D. Trial By Consent

Patricia argues the issue of retroactive child support was tried by consent because Clyde was questioned regarding child support with the date of separation as the starting date for the child support calculation. In support of her argument, Patricia points to Clyde's exhibits showing his payments to her from July 2011 through December 2012 and certain testimony by Clyde about the payments. Patricia contends Clyde submitted the exhibits for the purpose of asking the trial court to give him credit for paying child support retroactive to the date the parties separated.

The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 771 (Tex. App.—

Dallas 2005, pet. denied). Although that discretion is to be exercised liberally in favor of justice, trial by consent is the exception, not the rule, and should not be inferred in doubtful cases. *Id.* at 772. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Worford*, 801 S.W.2d at 109.

Trial by consent is a doctrine that is only intended to cover the exceptional case in which it clearly appears from the record as a whole that the parties tried the unpleaded issue, and it is not intended to establish a general rule of practice and should be applied with care. *In re A.B.H.*, 266 S.W.3d 596, 600 (Tex. App.—Fort Worth 2008, no pet.). To determine whether an issue was tried by consent, we must review the record not for evidence of the issue, but rather for evidence of *trial* of the issue. *Id.* (emphasis added). "Consent may be found only where evidence regarding a party's unpleaded issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint." *Id.* "On the other hand, trial by consent is inapplicable when evidence relevant to an unpleaded matter is also relevant to a pleaded issue; in that case admission of the evidence would not be calculated to elicit an objection, . . . and its admission ordinarily would not demonstrate a 'clear intent' on the part of all parties to try the unpleaded issue." *Case Corp.*, 184 S.W.3d at 771 (citation omitted). We therefore examine the record for evidence that the issue of retroactive child support was tried.

Although Patricia filed for divorce in January 2013, the couple first separated in late August 2011. Clyde periodically moved out of and into the shared home when the couple attempted to reconcile. Clyde testified he paid money to Patricia, from about mid-2011 through about mid-2016, which he described as for the purpose of trying to save his marriage, ensuring all the bills were paid, and providing for his children.[2] As part of his evidence, Clyde provided copies of

---

[2] The couple also have a daughter born in 1990.

checks he had written to Patricia. One of his exhibits indicated payments from July 2011 through December 2012, totaling $69,352.06. The other exhibit indicated payments from January 2013 through February 2014, totaling $54,050.

Clyde was questioned as follows:

Q. [referring to the first exhibit]: Okay. And this is before [Patricia] filed for divorce?
A. Before she filed for divorce, yes.

. . .

Q. Okay. Now, in here I noticed that you've given her like $69,000. Why did you give her that amount of money $69,000 over that period of time?
A. For two reasons. First of all, I was desperately trying to save our marriage. And secondly I wanted to make sure my kids were well provided for.

. . .

Q. [referring to the second exhibit]: And you have given her $54,000 during that time period. This is while the divorce is pending also.
Can you tell the Judge why did you do that?
A. I had wanted to make sure all the bills were paid. I was continuing to try to save our marriage and wanted to make sure my son was well provided for.

. . .

Q. Now, about the finances. You had testified that you made your last payment to Mrs. Patricia Kebodeaux in May of 2016?
A. Approximately.
Q. And may I ask why you only produced checks, the payments of Ms. Kebodeaux through February of 2014?
A. Because when I talked to Mr. Garza [his attorney] he said that the monies in question were whether I paid child support or not.
    Yesterday during my testimony I also mentioned that I had the bank statements from – at your – during the testimony to you that I had the bank statements for Navy Federal Credit Union but I could not produce the checks because they would have to be special ordered.
    But I do have the bank statements saying I paid approximately $800 to usually $800 to $1200 per month to Patricia up until that time.
    So, from the time the date of those checks from USAA until a year ago I have the bank statements that show that I paid that.
    In addition, I also wrote several money orders during that time frame and handed those to her as well.
Q. So, your contention is those checks were payment for child support?
A. It was not. My son had already surpassed the age of 18 at that point.

Q. Let me clarify. The checks that you produced copies of that ran through February 2014, is it your contention that those checks are evidencing child support?
A. It was child support and also to pay for the bills because she requested more money.

. . .

Q. Okay. And then from June of 2011 how long had you been giving her money before that stopped?
A. I'm sorry, repeat the question.
Q. Okay. In June of 2011 you made your own bank account, right?
A. Correct.
Q. Did you give her money after that day or after that date of June 2011?
A. I did. And those are the evidence documents that were provided to the Court.

Patricia was questioned as follows:

Q. Do you recall approximately how much money [Clyde] has given you since the two of you split in June of 2011? . . .
A. To the best of my recollection according to the deposit slips that I have we brought in $56,600.

. . .

Q. Okay. But you had been receiving money from Clyde up until a year ago?
A. Yeah.

When asked if she disputed the amounts shown on Clyde's two exhibits, she responded, "I

cannot dispute. This is my name on each one of those checks." She also said she did not ask Clyde

for money after May of 2016:

Q. Okay. And is that because you felt like you could handle whatever was going on?
A. That was because he told me point blank clear you will receive no more money from me.
Q. Okay. Now, if you would have just – did you disagree with his conclusion?
A. His conclusion?
Q. That you weren't going to get any more money.
A. Did I disagree with him?
Q. Did you disagree with that?
A. I did not question it.
Q. Okay.
A. So, as far as disagreeing my opinion is, yes, I disagreed. But I could not question that.

Q. Okay. You could have moved for temporary orders and come into court and asked for him to be forced to give you the money. Do you understand that, yes or no? Do you understand that, yes or no?
A. I do now.
Q. Okay. So, the fact is you didn't, right?
A. The fact is I did not, no.
Q. The fact is –
A. The fact is that I did not know I could.
Q. Okay.
A. And there was nothing saying that he's to pay me a certain amount of money in any of our legal paperwork.
Q. Didn't you talk to your lawyers and say, hey you know what, I need some money. Can you help me?
A. Last year I wasn't really in – talking to my lawyers. I was down in Tucson most of the time taking care of my mother that was dying. So, no.

The parties clearly understood evidence was being adduced for the purpose of establishing Clyde's support of his child prior to the date Patricia filed for divorce. At trial, Clyde did not object to the submission of the evidence. On appeal, he does not argue such evidence was relevant to another issue in the case. Therefore, on this record, we conclude the issue of retroactive child support was tried by consent, and the trial court did not act in an arbitrary or unreasonable manner without reference to any guiding rules or principles.[3]

**E. Amount of Child Support**

Clyde also asserts the trial court erred in determining the date the child support should begin and the total amount he paid to Patricia. We have already concluded the trial court did not abuse its discretion in determining Clyde owed child support retroactive from the date Patricia filed the divorce petition. Therefore, we do not address whether the court erred by determining Clyde was obligated to pay support for D.K. from the time the parties separated in August 2011. We address only Clyde's contention that the court erred by determining the amount owed based on Office of Attorney General tables, by awarding child support after June 2014 when D.K.

---

[3] Because we conclude the issue of retroactive child support was tried by consent, we need not address Patricia's argument that Clyde is estopped from raising the issue on appeal.

graduated from high school after already having turned eighteen years old in March 2014, and erred in determining the total amounts of payments he paid to Patricia.

"Child support, by definition, applies only to a child under the age of 18 years who has not yet graduated from high school or a high-school equivalent program." *Bartlett v. Bartlett*, 465 S.W.3d 745, 749 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "[P]ost-majority support is not child support." *Id.* (citation omitted). Here, the trial court determined Clyde was "obligated to provide support for D.K. from the time the Parties separated, August 31, 2011, through D.K.'s graduation from high school, June of 2016."

Family Code section 154.002 sets forth the conditions under which a court may order child support past the eighteenth birthday of the child:

> (a) The court may render an original support order, or modify an existing order, providing child support past the 18th birthday of the child to be paid only if the child is:
> (1) enrolled:
> (A) under Chapter 25, Education Code, in an accredited secondary school in a program leading toward a high school diploma;
> (B) under Section 130.008, Education Code, in courses for joint high school and junior college credit; or
> (C) on a full-time basis in a private secondary school in a program leading toward a high school diploma; and
> (2) complying with:
> (A) the minimum attendance requirements of Subchapter C, Chapter 25, Education Code; or
> (B) the minimum attendance requirements imposed by the school in which the child is enrolled, if the child is enrolled in a private secondary school.
> (b) The request for a support order through high school graduation may be filed before or after the child's 18th birthday.
> (c) The order for periodic support may provide that payments continue through the end of the month in which the child graduates.

TEX. FAM. CODE § 154.002.

Neither party disputes that D.K. turned eighteen years old in March 2014 and graduated from high school in June 2014. Therefore, Clyde was obligated to pay child support only through June 2014. The trial court obligated Clyde to pay child support "through D.K.'s graduation from

high school, June of *2016*." [Emphasis added.] If this was not merely a typographical error, then requiring child support payments beyond June 2014 was an abuse of discretion. However, because the trial court did not provide the calculations for the specific child support amount Clyde owed to Patricia,[4] the record does not reveal whether the court's error regarding the year in which D.K. graduated from high school affected the court's determination "that guideline child support *for this period of time* is eighty-one thousand three hundred and seventy dollars ($81,370.00)." [Emphasis added.] Therefore, we remand the issue of retroactive child support to the trial court for a determination of the correct amount paid by Clyde to Patricia, the correct amount owed by Clyde to Patricia, and whether findings pursuant to Family Code section 154.130 are required.

## DIVISION OF MARITAL ESTATE

Clyde asserts the trial court abused its discretion in dividing the marital estate in a manner that was not just and right.

### A. Applicable Law

"In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each

---

[4] Texas Family Code section 154.130 provides as follows:
> (a) Without regard to Rules 296 through 299, Texas Rules of Civil Procedure, in rendering an order of child support, the court shall make the findings required by Subsection (b) if:
> (1) a party files a written request with the court before the final order is signed, but not later than 20 days after the date of rendition of the order;
> (2) a party makes an oral request in open court during the hearing; or
> (3) the amount of child support ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable.
> (b) If findings are required by this section, the court shall state whether the application of the guidelines would be unjust or inappropriate and shall state the following in the child support order:
> "(1) the net resources of the obligor per month are $_____;
> "(2) the net resources of the obligee per month are $_____;
> "(3) the percentage applied to the obligor's net resources for child support is _____%; and
> "(4) if applicable, the specific reasons that the amount of child support per month ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable."
> (c) Findings under Subsection (b)(2) are required only if evidence of the monthly net resources of the obligee has been offered.

party and any children of the marriage." TEX. FAM. CODE § 7.001. The trial court is not required to divide the marital estate equally; however, its division must be equitable. *Matter of Marriage of Elabd*, 589 S.W.3d 280, 287 (Tex. App.—Waco 2019, no pet.). We review a trial court's division of property for an abuse of discretion. *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.). To constitute an abuse of discretion, the trial court's division of the property must be manifestly unjust and unfair. *See Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980); *Evans v. Evans*, 14 S.W.3d 343, 345-46 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "The trial court's discretion is not unlimited, and there must be some reasonable basis for an unequal division of the property." *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). We resolve every reasonable presumption in favor of a proper exercise of discretion of the trial court in dividing the property of the parties. *Chavez v. Chavez*, No. 14-14-00481-CV, 2016 WL 1613240, at *5 (Tex. App.—Houston [14th Dist.] April 21, 2016, no pet.) (mem. op.).

"A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision." *Garza*, 217 S.W.3d at 548. "Further, we review a trial court's findings for legal and factual sufficiency." *Id.* at 549. In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review; therefore, legal and factual insufficiency are not independent grounds of reversible error. *Id.* Instead, they constitute factors relevant to our assessment of whether the trial court abused its discretion. *Id.* In considering whether the trial court abused its discretion because the evidence is legally or factually insufficient, we apply a two-prong test: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion. *Id.* We then consider whether, based on the evidence, the trial court made a reasonable decision. *Id.*

Furthermore, because the trial court is in a better position to determine the candor, demeanor, and credibility of the witnesses, we will not substitute our judgment for that of the trial court. *See In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting trial court is best able to observe and assess witnesses' demeanor and credibility and to sense "forces, powers, and influences" that may not be apparent merely from reading the record on appeal). Instead, we defer to the trial court's resolution of underlying facts and to the credibility determinations that may have affected its decision. *Id.* Thus, an abuse of discretion generally will not occur when a trial court bases its decision on conflicting evidence. *In re De La Pena*, 999 S.W.2d 521, 526 (Tex. App.—El Paso 1999, no pet.).

## B. Background

At trial, each party submitted their Inventory and Appraisement sheets identifying assets and liabilities. After trial on the merits ended, the trial court's "judge's notes" divided the marital estate approximately fifty-fifty.[5] However, before the divorce decree was reduced to writing, Patricia filed a motion to modify, correct, or reform the judgment as it related to the division of the community estate. Among her allegations, Patricia contended:

> B. When counsel discussed a specific dollar amount regarding child support, the dollar amount identified by counsel was the unpaid child support that was still due and owing to [Patricia] if you took the total amount of money paid by [Clyde] to [Patricia] to have first covered one half (50%) of the expenses related to the two houses. In its calculations, the Court used the dollar amount identified as the total amount of child support that [Clyde] owed for the entire time running from the parties' separation until both children reached 18 years old.
>
> . . .

---

[5] In his appellant's brief, Clyde contends (1) the assets awarded to him, excluding the value of two real properties, amounted to $178,526.63 and fifty-six percent of his military retirement and (2) the court did not award Patricia retroactive child support. He also contends the assets awarded to Patricia, excluding the value of two real properties, amounted to $171,845, forty-four percent of his military retirement, and the contents of the marital home. In her appellate brief, Patricia stated she "does not challenge the affirmative details Clyde states" in this portion of his brief.

D. [Clyde] had repeatedly failed to produce his bank statements, ultimately producing them only once trial had begun, which did not allow [Patricia] time to review the statements thoroughly until after trial. Upon a comprehensive review of [Clyde's] bank statements from May 2014 through May 2016, entered into the record as "Respondent's Exhibit 8," we find that [Clyde] withdrew a total of $77,873.00 in cash during this period. This withdrawn cash is unaccounted for and represents only a two-year period of the nearly six years between the Parties' separation and the Parties' divorce and was not considered by the Court in making its current ruling.

E. In the year between the trial and the court making its ruling, significant repairs were made to the community property houses. Said repairs increased the value of the properties and were made by or paid for entirely by [Patricia]. The Court should consider the money spent by [Patricia] and the value of [Patricia's] time and effort spent maintaining and repairing the houses.

A hearing was conducted on Patricia's motion to modify and the motion was granted on October 8, 2019 but no reporter's record was taken. On December 10, 2019, the trial court signed the final divorce decree. The trial court later signed findings of fact and conclusions of law. The trial court found, among other things, that (1) Clyde "was obligated to provide support for D.K. from the time the Parties separated, August 31, 2011, through D.K.'s graduation from high school, June of 2016; (2) "guideline child support for this period of time is eighty-one thousand three hundred and seventy dollars ($81,370.00)"; (3) "child support in the amount of $81,370.00 has been provided by [Clyde] to [Patricia], and as of the date of this order, [Clyde] owes $0.00 in current and back child support for D.K."; (4) "[d]uring the pendency of the divorce proceedings [Clyde] paid [Patricia] a total of $121,402, of which $40,032 was not deemed child support"; (5) "[d]uring the pendency of the divorce proceedings [Clyde] withdrew $81,738 in unaccounted for cash from his bank accounts"; and (6) during the marriage Clyde acquired two Thrift Savings Plans ("TSP"), a civil service TSP in the amount of $58,093 and a Department of Defense ("DoD") TSP in the amount of $63,316.

Clyde later filed a motion for new trial, which was denied after a hearing.

## C. Clyde's Complaints on Appeal

Clyde asserts the trial court erroneously duplicated his TSP, determined he "withdrew $81,738 in unaccounted-for cash from his bank accounts," and awarded Patricia a disproportionate share of the martial estate.

### 1. Clyde's TSP

Clyde asserts the evidence is legally and factually insufficient to support the trial court's finding that he had two TSPs. He contends he has only a single TSP with the DoD, which he disclosed on his Inventory and Appraisement. He also points to Patricia's Inventory and Appraisement where she also listed only a single TSP as belonging to Clyde. Clyde states his testimony at trial supports his contention that he had only a single TSP with the DoD as a *civil servant,* and he did not have a DoD *military* TSP. Clyde argues the evidence shows his single TSP had a value of $58,092.95 in December 2016 and increased in value to $63,316.88 by April 25, 2017. According to Clyde, the divorce decree erroneously duplicated his TSP by identifying one as a DoD TSP and the other as a Civil Service TSP, using two different time periods with two different values.

Patricia concedes her Inventory and Appraisement listed only a single TSP for Clyde. However, she alleges she identified an account different from Clyde's because her Inventory and Appraisement never identified the TSP as a civil service TSP, she identified the account by number, and with a "starting date of credible service" as March 2008. According to Patricia, Clyde was still active-duty military in 2008 and, by his own testimony, did not begin work as a civilian contractor for the DoD until February 2013 and he worked in the private sector for approximately five years. Therefore, she contends she did not list Clyde's civil service TSP on her Inventory and Appraisement because Clyde did not start work as a civilian contractor until 2013, almost two years after the couple separated. She argues Clyde never introduced any evidence at trial that

resolved the uncertainty about whether he had one or two TSPs. On appeal, she does not contend she presented any additional evidence on the issue during the trial or at the hearing on her motion to modify the judgment.

At trial, the Inventory and Appraisements filed by each party were admitted into evidence. Patricia's Inventory and Appraisement listed the following under the heading "Retirement Benefits":

> 9.A.l. Exact name of plan: THRIFT SAVINGS PLAN
> Name and address of plan administrator: Department of Defense
> Employee: CLYDE KEBODEAUX
> Employer: USAF
> Starting date of creditable service: March 2008
> Account name: TSP
> Account number: 2009720315646
> Account balance as of date of marriage: $0
> Payee of survivor benefits: PATRICIA KEBODEAUX
> Designated beneficiary: PATRICIA KEBODEAUX
> Current account balance (as of 12/31/16): $58,092.95
> Balance of loan against plan: $0.00
> Value of community interest in plan (as of 12/31/16): $58,092.95

She was not asked any questions about the TSP. Clyde's Inventory and Appraisement listed the following: (1) a Booz Allen Hamilton Employee Capital Fund ("ECF") with a value of $55,118.32 as of February 2017, (2) his military retirement benefits from the United States Air Force, and (3) a "Thrift Savings Plan (Department of Defense) as of Apr 25, 2017 $63,316.88."

At trial, Clyde testified he was currently employed by the United States Air Force as a civilian contractor, and he started the job in February 2013. For the five years before his current position, he worked for Booz Allen Hamilton. Prior to Booz Allen Hamilton, he served in the military for the United States Air Force, Department of Defense, since 1985. Clyde testified he had several retirement accounts: a TSP with the Air Force as a civil servant, an ECF with Booz Allen Hamilton, and a retirement pension from the Air Force. During questioning about his TSP account, the following examination occurred:

Q. Do you recall the current balance of your DOD TSP?

A. I don't have a DOD TSP.

Q. Earlier you said you had three, the three savings accounts for retirement. You had the civil service, a DOD and the ECF.

A. I said I had a DOD pension that I receive every month. That's – that's not a retirement account.

Q. It's retired pay?

A. Correct.

Q. That's not an account. That's retired pay?

A. My apologies, counsel.

Q. You're saying you only have two retirement accounts total?

A. That's correct.

Q. And again just to clarify that is your ECF from Booz Allen Hamilton and your civil service TSP?

A. That's correct.

. . .

Q. (BY MR. METZ) And one last question. Yesterday when I asked you about your TSP accounts you said you had a civil service account and the Booz Allen Hamilton; is that correct?

A. I have a civil service Thrift Savings Account and a Booz Allen Hamilton Employee Capital Fund account.

Q. And you do not have a DOD TSP account?

A. I do not have a DOD TSP – a DOD military TSP account.

MR. METZ: May I approach, Your Honor?

[Clyde was handed his May 17, 2017 Inventory and Appraisement]

Q. (BY MR. METZ) Can you turn to the very last page. And there are several items handwritten on this page, correct?

A. Correct.

Q. Can you read the third item down?

A. Thrift Saving Plan, Department of Defense as of April 25th, 2017. $63,316.88.

Q. So, that does indicate that you have a Department of Defense Thrift Savings Plan?

A. It's a civil service Department of Defense Thrift Savings Plan, that's correct.

. . .

Q. (BY MR. METZ) So, your statement is that it is a civil service Department of Defense Thrift Savings Plan?

A. Yes. That's the only one I have.

Q. You said the current amount was 63,000?

A. I believe that's correct. Yes.

Q. Do you know what the account number is on the thrift savings listed on your inventory appraisement?

A. On my Thrift Savings Plan?

Q. Yes.
A. I do not recall that account number.
Q. But you said it had a current balance of 63, correct?
A. Yes. That's correct.
Q. You have -- we have a statement from a Thrift Savings Plan with your name on it that has a balance of $55,000. Do you know which account that is?
A. I don't think I had anything saying that I had another thrift savings account for 55,000. If I did I may have written it down incorrectly.
   I believe I wrote that my Booz Allen Hamilton ECF account that I was able to get information for in February of 2017 over the telephone was for approximately 55,000. As best as I can recall.
MR. METZ: May I approach, Your Honor?
THE COURT: You may.
Q. (BY MR. METZ) Can you identify what this document is?
A. Yes. This is a Thrift Savings Plan document.
Q. Is that – that's the document related to your Thrift Savings Plan?
A. This will be one in the same, I believe.
Q. Can you tell me what the balance is listed on this account?
A. $58,092.95.

"Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). "The record contains more than a mere scintilla of evidence when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* "Conversely, the record contains less than a scintilla when the evidence offered to prove a vital fact's existence is 'so weak as to do no more than create a mere surmise or suspicion.'" *Id.* (citation omitted). "All the record evidence must be considered 'in the light most favorable to the party in whose favor the verdict has been rendered,' and 'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'" *Id.* (citation omitted). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is

no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

Clyde's testimony that he had only a single TSP was uncontroverted and both Inventory and Appraisements listed only a single TSP owned by Clyde. Other than her own Inventory and Appraisement, Patricia presented no other evidence regarding Clyde's ownership of one or more TSPs. Her Inventory and Appraisement is less than a scintilla of evidence raising only surmise and suspicion that Clyde had two TSPs. Having considered the evidence in the light most favorable to the trial court's finding, and indulging every reasonable inference that would support it, we conclude the evidence was legally insufficient to support a finding that Clyde had two TSPs.

### 2. Unaccounted-for withdrawal of $81,738

Clyde next raises several complaints regarding the trial court's finding that, "during the pendency of the divorce proceedings [he] withdrew $81,738 in unaccounted-for cash from his bank accounts." On appeal, Clyde contends the only plausible explanation for the disproportionate award was an allegation in Patricia's motion to modify the judgment that his bank account contained unexplained withdrawals. He first argues (1) the issue of fraud or waste was not raised in Patricia's pleadings, therefore, he did not receive fair notice; (2) the issue was not tried by consent; and (3) constructive fraud or waste was not presumed. Clyde also asserts, in the alternative, that the evidence is legally and factually insufficient to support Patricia's claim that he withdrew $19,000 from a joint bank account. Finally, Clyde argues there is no support in the appellate record that he repeatedly failed to produce his bank statements.

In Patricia's motion to modify, she alleged as follows:

D. [Clyde] had repeatedly failed to produce his bank statements, ultimately producing them only once trial had begun, which did not allow [Patricia] time to review the statements thoroughly until after trial. Upon a comprehensive review of [Clyde's] bank statements from May 2014 through May 2016, entered into the record as "[Clyde's] Exhibit 8," we find that [Clyde] withdrew a total of $77,873.00

in cash during this period. This withdrawn cash is unaccounted for and represents only a two-year period of the nearly six years between the Parties' separation and the Parties' divorce and was not considered by the Court in making its current ruling.

A hearing was conducted on Patricia's motion, but no record was taken. After the trial court signed the divorce decree, Clyde filed a motion for new trial in which he did not raise any of the complaints he now raises on appeal. During the hearing on Clyde's new trial motion, he argued:

> In addition to that, Judge, now I know that $81,000 is unaccounted for as the cash and that had been – my client was not able to show where that 81,000 [sic]. But we believe that actually half of that amount should have been taken, if the Court wanted to reconstitute the estate, half of that amount should have been given from Mr. Kebodeaux's side to Mrs. Kebodeaux's side. Mr. Kebodeaux's side to Mrs. Kebodeaux's side.

The trial court denied Clyde's motion for new trial and later signed findings of fact and conclusions of law, which included the following: "During the pendency of the divorce proceedings [Clyde] withdrew $81,738 in unaccounted for cash from his bank accounts." The trial court did not make any findings regarding fraud or waste or regarding a $19,000 withdrawal from any bank account.

We conclude Patricia's motion to modify provided Clyde with fair notice that she was challenging the trial court's initial property division based on Clyde's alleged unaccounted-for withdrawal of funds. Furthermore, it was Clyde's burden to furnish this court with a record that supports his allegations. *See Burton v. Prince*, 14-17-00783-CV, 2019 WL 1339655, at *3 (Tex. App.—Houston [14th Dist.] Mar. 26, 2019, no pet.) (mem. op.). Certainly there are circumstances when a complete record may not be necessary for the resolution of an issue of law that does not require the review of evidence. *Id.* Those circumstances do not exist here. Absent a complete record, we must presume the omitted portions of the record are relevant to the disposition of the appeal and that they support the trial court's judgment. *Id.* Because our appellate record contains

no reporter's record of the hearing on Patricia's motion to modify, we presume the unrecorded proceeding supports the trial court's finding that Clyde withdrew "$81,738 in unaccounted for cash from his bank accounts" while the divorce was pending.

### 3. Rental property income

The trial court found that "[d]uring the pendency of the divorce proceedings Patricia Kebodeaux expended a net total of $110,421.86 on the mortgages and maintenance of 9403 Massaro, San Antonio, TX and 4542 S. White Pine, Tucson, AZ." On appeal, Clyde entitles his issue as "The Rental Property Income," but he raises numerous arguments, including that the evidence is legally and factually insufficient to support this amount (which should be recalculated); the court miscalculated the beginning and ending dates of any child support (which should be recalculated and applied to the amount Clyde contributed to mortgages and expenses); Patricia cannot complain about Clyde's sole managed bank accounts; and complaints regarding the unaccounted-for cash withdrawals. Clyde concludes as follows:

> There is legally and factually insufficient evidence to support the trial court's findings that Patricia was entitled to a disproportionate share of the marital estate as the evidence shows that Clyde's payments of $155,330.22 to Patricia, plus 100% of the rental royalties more than compensated her for her ½ community interest in Clyde's cash withdrawals of $57,180 of his own personal earnings from his own solely managed bank account. The trial court's conclusion of law that the division was just and right is unsupported by any controlling findings of fact to support the judgment under any legal theory resulting in a grossly and manifestly unjust and unfair division of the marital estate in favor of Patricia and against Clyde.

> This is not a case where a husband financially abandoned his wife or child. In fact, it is just the opposite. Clyde continued to support Patricia and D.K. for years while Clyde and Patricia were separated. Clyde was responsible and consistent in his financial obligations even when they were not court ordered.

An issue on appeal addressing more than one specific ground of error is multifarious. *Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex. App.—San Antonio 1999, pet. denied). If we conclude an issue is multifarious, we may refuse to review it or may consider the issue if we can

determine, with reasonable certainty, the error about which complaint is made. *Id.* We are unable to discern, with reasonable certainty, all of Clyde's complaints within this issue; therefore, we do not review it.

**CONCLUSION**

As explained above, we conclude the issue of retroactive child support was tried by consent; however, the final decree mistakenly indicates D.K. graduated from high school in June 2016, and the record does not reveal whether the court's error regarding the year in which D.K. graduated from high school affected the court's determination "that guideline child support for this period of time is eighty-one thousand three hundred and seventy dollars ($81,370.00)." Therefore, we reverse the Final Decree of Divorce insofar as it determines Clyde "is obligated to provide support for D.K. . . . through D.K.'s graduation from high school, June of 2016," and remand the issue to the trial court for a determination of the correct amount paid by Clyde to Patricia, the correct amount owed by Clyde to Patricia, and whether findings pursuant to Family Code section 154.130 are required.

We also conclude the trial court erred by determining Clyde possessed two TSPs. The trial court may have further erred in calculating the amount of retroactive child support and, therefore, erred in finding that "[d]uring the pendency of the divorce proceedings Clyde E. Kebodeaux paid Patricia Kebodeaux a total of $121,402, of which $40,032 was not deemed child support." To the degree any of these errors or potential errors factored into the court's division of the marital estate, we reverse that portion of the Final Decree of Divorce insofar as it divided the parties' marital estate and remand for further proceedings consistent with this opinion.

We affirm the Final Decree of Divorce in all other respects.

Lori I. Valenzuela, Justice